UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALEJANDRO DOMINGO MALVAR EGERIQUE,

Plaintiff,

-v.-

EZRA CHOWAIKI, DAVID BENRIMON FINE ART
LLC, LINDA BENRIMON, PIEDMONT CAPITAL
LLC, AVICHAI ROSEN, DAVID BENRIMON, and
JOHN DOES 1-10,

Defendants.

19 Civ. 3110 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff Alejandro Domingo Malvar Egerique is understandably upset.
He was deprived of two valuable artworks of which he was the rightful owner,
and the person responsible for that deprivation was ultimately convicted of
fraud charges in this District. Unsatisfied with the results of the criminal
prosecution and a related bankruptcy proceeding, Plaintiff has decided to take
matters into his own hands, bringing a civil lawsuit under the Racketeer
Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968,
against a wide swath of individuals (collectively, "Defendants") he blames for
his losses. In relevant part, Plaintiff alleges that: (i) Ezra Chowaiki, the
convicted art dealer, used his art gallery to engage in a pattern of fraudulently
acquiring and selling artwork; (ii) David and Linda Benrimon, through their art
gallery David Benrimon Fine Art LLC ("DBFA"), engaged in a pattern of selling
artwork that they had no legal right to sell; (iii) the Benrimons, through DBFA,
engaged in the unlawful collection of debt; (iv) Avichai Rosen, through his

enterprise, Piedmont Capital LLC ("Piedmont"), also engaged in the unlawful collection of debt; (v) Defendants conspired to facilitate each of the previously mentioned RICO violations; and (vi) Defendants committed analogous state-law claims of fraud, conversion, and replevin.

Because of the sanctions and stigma attendant to them, civil RICO claims are notoriously — and appropriately — difficult to plead.  Chowaiki has moved to dismiss the claims against him, and the remaining Defendants, David and Linda Benrimon, DBFA, Piedmont, and Rosen (collectively, the "Benrimon Defendants"), have separately moved to dismiss the claims against them.  The Benrimon Defendants have also moved for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.  For various reasons outlined herein, Plaintiff has not pleaded viable RICO claims in this case.  Accordingly, Chowaiki's motion to dismiss is granted in part and denied in part; the Benrimon Defendants' motion to dismiss is granted in part and denied in part; and the Benrimon Defendants' motion for Rule 11 sanctions is granted in part and denied in part.

## BACKGROUND

### A.     Factual Background[1]

#### 1.     The Parties

Plaintiff is a citizen and resident of Spain, and the owner of two works of art, *le Gueridon* by Pablo Picasso (the "Picasso"), and *Composition avec Profil de*

---

[1]     The facts in this Opinion are drawn primarily from Plaintiff's First Amended Complaint ("Complaint" or "Compl." (Dkt. #26)), which is the operative pleading in this case.  The Court notes here that the Complaint contains an abundance of conclusory allegations. For purposes of these motions, the Court considers and accepts only the factual

*Femme* by Fernand Leger ("the Leger").  (Compl. ¶¶ 3, 4).  Plaintiff acquired both works of art at a sale at Sotheby's in London on February 6, 2007.  (*Id.* at ¶ 4).  The Picasso was purchased as Lot 0152, and the Leger was purchased as Lot 0235.  (*Id.*).

Because Plaintiff alleges several RICO enterprises involving different permutations of the defendants, a word about each Defendant is in order. During the relevant time period, Ezra Chowaiki was the Chief Executive Officer and one of the owners of Chowaiki & Co. Fine Art Ltd. (the "Gallery"), an art gallery in New York City.  (Compl. ¶ 5).  On or about November 13, 2017, the Gallery filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  *See In re Chowaiki & Co. Fine Art Ltd.*, No. 17-13228 (MKV) (Bankr. S.D.N.Y. Nov. 13, 2017) (the "Bankruptcy Case").  Six months later, on May 3, 2018, Chowaiki pleaded guilty to a single count of wire fraud, in violation of 18 U.S.C. § 1343, in this District, relating to his theft of several pieces of artwork.  *See United States* v. *Ezra Chowaiki*, No. 18 Cr. 323 (JSR) (the "Criminal Case").  As part of Chowaiki's plea and sentencing, Chowaiki agreed to forfeit to the United

---

allegations that are well-pleaded.  *See Lynch* v. *City of New York*, 952 F.3d 67, 74-76 (2d Cir. 2020).

For ease of reference, the Court refers to Chowaiki's opening brief as "Chowaiki Br." (Dkt. #31); the Benrimon Defendants' opening brief as "Benrimon Br." (Dkt. #33); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #39); Chowaiki's reply brief as "Chowaiki Reply" (Dkt. #45); and the Benrimon Defendants' reply brief as "Benrimon Reply" (Dkt. #46).  Further, the Court refers to the Benrimon Defendants' motion for Rule 11 sanctions as "Benrimon Sanctions Br." (Dkt. #36); Plaintiff's opposition to the Benrimon Defendants' motion for sanctions as "Pl. Sanctions Opp." (Dkt. #41); and the Benrimon Defendants' reply brief in support of their motion for sanctions as "Benrimon Sanctions Reply" (Dkt. #47).

States 26 works of art that were the proceeds of his crimes. (*Id.*). The Picasso is one of the forfeited works. (*Id.*).

DBFA is an art gallery in New York City. (Compl. ¶ 6). David Benrimon is the Director and Chief Executive Officer of DBFA. (*Id.* at ¶ 7). Linda Benrimon is the Executive Director of DBFA. (*Id.* at ¶ 8). She is also the daughter of David Benrimon and the spouse of Avichai Rosen. (*Id.*). As Director and Executive Director of DBFA, respectively, David and Linda Benrimon buy and sell art for DBFA. (*Id.* at ¶ 19). Piedmont, of which Rosen is a principal, is a boutique investment manager specializing in strategic investments in alternative asset classes, including artwork. (*Id.* at ¶¶ 9-10).[2] As noted above, the Court refers to DBFA, David and Linda Benrimon, Avichai Rosen, and Piedmont as the "Benrimon Defendants."

### 2. Plaintiff Consigns the Picasso and the Leger to Chowaiki and the Gallery

Immediately after purchasing the Picasso and the Leger from Sotheby's in February 2007, Plaintiff installed them in his home in Spain, where they remained for eight years. (Compl. ¶ 34). On April 27, 2015, Plaintiff's brother, Benito Malvar, at Plaintiff's instruction and authority, and on Plaintiff's behalf, consigned the Picasso and the Leger to the Gallery. (*Id.* at ¶ 35). Plaintiff sent the two pieces of art to the Gallery that month (*id.* at ¶ 34), and they arrived in early June 2015 (*id.* at ¶ 36). After the consignments expired, Plaintiff —

---

[2]    Plaintiff also names John Does 1-10 as additional defendants "who, through their own actions, or their actions through agents, conspired with and/or participated in the pattern of racketeering acts and activity, the collection of unlawful debt, and other fraudulent and unlawful acts and activity set out [in the Complaint]." (Compl. ¶ 11).

through his brother and through Chowaiki's agent — repeatedly demanded the return of the artwork. (*Id.* at ¶ 37). Chowaiki promised by telephone and email to return the artwork, but never did so. (*Id.* at ¶¶ 37, 105).

Instead, Chowaiki converted the artwork for his own purposes. In January or February of 2017, Chowaiki, through the Gallery, sold and shipped the Leger from New York to Glowside Investment Trading, the listed address of which was 115 George Street, 4th Floor, Edinburgh, Scotland, United Kingdom. (Compl. ¶ 106). Chowaiki received money from that sale that was never shared with Plaintiff. (*Id.*). More troublingly, Glowside Investment Trading does not exist, and no such entity maintains an office at the address given in Edinburgh or elsewhere. (*Id.* at ¶ 107). Further, as described below, Plaintiff alleges that Chowaiki also sold the Picasso without Plaintiff's knowledge or authorization.

### 3. The Alleged Schemes

Plaintiff's Complaint outlines several frauds or schemes that, he alleges, constitute predicate acts sufficient to support his RICO claims. To set the stage for its legal analysis, the Court describes those schemes in the remainder of this section.

### a. The Latamie Acts

The first scheme concerns the sale of Andy Warhol artwork in which DBFA is alleged to have been involved. On February 2, 2012, DBFA — or Benrimon Contemporary LLC, a related art gallery — sold a painting and a set of ten Mao Zedong prints, all by Warhol, to Marc Latamie and DM Fountain,

Inc. ("DM"), Latamie's corporate entity, for $1,750,000. (Compl. ¶ 24). The Warhol painting was delivered to Latamie and DM. (*Id.*). However, neither DBFA nor Benrimon Contemporary LLC delivered the complete set of ten Mao Zedong prints to Latamie or DM. (*Id.*).

Cribbing from a state-court complaint filed by Latamie and DM against Benrimon Contemporary LLC, DBFA, David Benrimon, and son Leon Benrimon, Plaintiff alleges that, in connection with the Warhol transaction, Latamie and DM negotiated with, *inter alia*, several members of the Benrimon family. (Compl. ¶ 25). David and Linda Benrimon, in particular, repeatedly promised Latamie and DM that they (the Benrimons) would deliver the Warhol prints to the purchasers, despite the fact that Benrimon Contemporary LLC never had ownership, custody, or control over these prints. (*Id.* at ¶ 26). Plaintiff also alleges that David and Linda Benrimon, through DBFA, sold and delivered to others the very same Warhol prints that they supposedly sold, but failed to deliver, to Latamie and DM. (*Id.* at ¶ 27).

### b.    The Pledge Agreement Acts

The second scheme alleged by Plaintiff involved David and Linda Benrimon, through DBFA, acquiring works from Chowaiki and the Gallery — works they knew Chowaiki and the Gallery did not own — at deeply discounted prices. In support of this claim, Plaintiff alleges the following facts:

On September 19, 2017, David and Linda Benrimon, on behalf of DBFA, agreed to acquire three works of art in a bulk transaction from the Gallery. (Compl. ¶ 45). These were the Picasso; Takashi Murakami's *Jellyfish Eyes*

6

(*Black I*) (the "Murakami"), which belonged to Thomas Morgan; and Pablo

Picasso's *Le Clown* ("*Le Clown*"), which belonged to Andrew and Kristen

Neumann.  (*Id.*).  David and Linda Benrimon structured this transaction with

Chowaiki so that Piedmont would "lend" Chowaiki and his Gallery money that,

by design, would not be repaid, using the works of art as "collateral" for the

"loan."  (*Id.* at ¶ 44).

Plaintiff cites several emails between David Benrimon and Chowaiki

confirming the loan transactions.  (Compl. ¶ 47).  He also cites the loan

documents comprising the transaction, which include: (i) a "Note" for a loan of

$300,000.00 from Piedmont to the Gallery, to be repaid in 30 days, together

with $50,000.00 interest, for a total uncompounded annual interest rate of

202.18%; (ii) a "Pledge Agreement" in which Piedmont is given the Picasso, the

Murakami, and *Le Clown* as security for repayment of the loan; (iii) a "Shtar

Isko"[3] in which the $300,000.00 loan creates a 50%-50% partnership between

Piedmont and Chowaiki; and (iv) a "Release and Settlement Agreement" in

which the parties agreed that, in light of the Gallery's failure to repay the

$300,000.00 loan plus $50,000.00 in interest when due on October 19, 2017,

all title and ownership of the three artworks passed to Piedmont.  (*Id.* at ¶ 48).

Plaintiff alleges that while Piedmont was listed as the lender in the documents,

the transactions were negotiated by David and Linda Benrimon, on behalf of,

---

[3]     A Shtar Isko, also called a "Heter Iska," is a document that is employed when one
        Jewish person lends money to another to avoid the Talmudic prohibition on lending
        money for interest.  *See Madison Park Investors LLC* v. *488-486 Lefferts LLC*, 2015 N.Y.
        Slip Op. 30178(U) (Trial Order), 2015 WL 471786, at *10 n.3 (N.Y. Sup. Ct. Feb. 5,
        2015).

and from, DBFA, and that the $300,000.00 loan was listed on the books and records of the Gallery as being from David Benrimon.  (*Id.* at ¶ 50).

Significantly, Plaintiff claims that, at the time of the loan agreement, the Benrimon Defendants knew or should have known that: (i) Chowaiki had a court-documented history of selling and pledging artwork, particularly previously consigned artwork, that neither he nor his Gallery owned or had a right to sell or pledge; (ii) Chowaiki was in desperate financial straits, had no assets, and was likely insolvent; (iii) Chowaiki was selling or pledging artwork that he did not own and had no right to sell or pledge; (iv) Chowaiki needed the $300,000 to pay off another loan, and by depleting his inventory by hypothecating or selling three works of art at steeply discounted prices, it would be impossible to pay back the loan at 202.18% interest within 30 days, or to remain in business; (v) Chowaiki would not and could not fulfill the terms of the Shtar Isko to buy and sell works of art with the $300,000 loan because the $300,000 loan was needed immediately to pay off another loan; (vi) there was a real likelihood that Chowaiki would be arrested for his fraudulent activity; (vii) Chowaiki was selling artwork in bulk at deeply discounted prices, thus giving a clear warning that those works were stolen; and (viii) the price for the three works of art was less than one-third of their true value.  (*Id.* at ¶ 55). Further, Plaintiff claims that while the Benrimon Defendants and Chowaiki were structuring the loan for which the Picasso was posted as collateral, the Benrimon Defendants had in their possession a document titled "Provenance" that described the most recent ownership of the Picasso as "Sale Sotheby's

8

London, 6 February 2007, lot 152 Private Collection (acquired at the above sale)." (*Id.* at ¶ 52).

On October 4, 2017, David and Linda Benrimon, on behalf of DBFA, picked up the Picasso from the Gallery. (Compl. ¶ 62). Thereafter, the Benrimons transported the Picasso (or caused it to be transported) to Europe. (*Id.* at ¶ 21). The Picasso has been transported several times — once from Italy to Switzerland in the spring or summer of 2018, a second time from Switzerland to London in the summer or fall of 2018, and a third time from London to Switzerland a few weeks thereafter. (*Id.* at ¶ 64). Further, from March 13 through May 25, 2018, the Picasso was exhibited at the Tega Gallery in Milan. (*Id.* at ¶ 67). Plaintiff alleges that David and Linda Benrimon continue to pay for the Picasso's storage and concealment abroad. (*Id.* at ¶ 72).

### c. The Court Filing Acts

Critical to the success of these schemes of deprivation, Plaintiff alleges, were schemes to create false paper trails. In this regard, Plaintiff alleges that, in order to conceal the true nature of the acquisition of the three works of art by the $300,000 loan, each of the Benrimon Defendants caused numerous "fraudulent" electronic filings to be made in the Bankruptcy Case and Criminal Case. (Compl. ¶ 73). In those filings, Piedmont asserts ownership of the Murakami and *Le Clown*, two of the works taken as security for the $300,000 loan. (*Id.*). Further, Piedmont's verified petition for the Murakami and *Le Clown* in the Criminal Case omits the existence of the Shtar Isko, which shows that Chowaiki and Piedmont were actually 50-50% equal partners and not

9

unrelated *bona fide* purchasers for value.  (*Id.* at ¶ 76).  Plaintiff alleges that these filings were "fraudulent" because they were intended to deceive other owners of the artwork, the creditors of Chowaiki's Gallery, the victims of Chowaiki's crimes, the Bankruptcy Case Trustee, the courts, and law enforcement officials into believing that David and Linda Benrimon and DBFA had nothing to do with these fraudulent transactions.  (*Id.* at ¶ 74).

### d.   The *Le Compotier* Acts

The fourth fraudulent scheme alleged in the Complaint concerns a transaction between the Benrimons and Chowaiki in which Plaintiff was not involved.  In brief, David and Linda Benrimon acquired *Le Compotier* by Juan Gris from Chowaiki and the Gallery at some point before the summer of 2017. (Compl. ¶ 29).  However, *Le Compotier* was owned by Eli Sakhai or his company, The Art Collection Inc., and Chowaiki and his Gallery had no right to sell it.  (*Id.* at ¶ 30).

Plaintiff alleges that the Benrimons acquired *Le Compotier* with full knowledge of the fact that Chowaiki and his Gallery did not own it.  (Compl. ¶ 29).  As support, Plaintiff cites to a complaint filed by The Art Collection Inc. against David Benrimon and DBFA, in which Sakhai alleges that he "specifically told [defendant David Benrimon] that he [Sakhai] owned" *Le Compotier*, and that he (Sakhai) had consigned the work to the Gallery, but "had demanded that Chowaiki and Chowaiki & Co. return that painting to" Sakhai's corporation, and, further, that David Benrimon and DBFA should not pay either Chowaiki or his Gallery for the painting because neither Chowaiki

nor his Gallery owned the painting or had the right to sell it to the Benrimons. (*Id.* at ¶ 31).

### e.     The Fraud Allegations Specific to Chowaiki

Plaintiff's Complaint also contains certain allegations directed specifically towards Chowaiki and his Gallery.  (*See* Compl. ¶¶ 95-111).  Specifically, Plaintiff alleges that from its inception through at least July 20, 2009, Chowaiki conducted the Gallery's affairs through repeated acts of wire fraud in which he obtained customers' artworks by fraudulently telling them he would sell them on consignment, when in fact he used those artworks as collateral for loans.  (*Id.* at ¶ 96).  Plaintiff alleges that, during this time, Chowaiki used $13 million worth of artwork as collateral, without his clients' knowledge or consent.  (*Id.* at ¶ 97).

Plaintiff's only specific example of this type of fraud is the conduct defined earlier as the Pledge Agreement Acts.  To substantiate the allegation that Chowaiki engaged in similar conduct repeatedly, Plaintiff relies exclusively on documents filed in the Criminal Case and Bankruptcy Case.  Beginning with the former, Plaintiff cites the criminal complaint filed against Chowaiki, which alleges that Chowaiki, with others,

> through the use of e-mail messages, telephone calls, and electronic fund transfers, defrauded purchasers and sellers of fine art by deceiving them into sending funds or artwork to his gallery in New York, New York under the false pretenses that CHOWAIKI would either use the funds to purchase works of art, or that he could sell the artworks that had been provided to him when, in truth and fact, CHOWAIKI never made such purchases and sales.

(Compl. ¶ 99 (quoting Criminal Case, Dkt. #1)).  Plaintiff also notes that

Chowaiki pleaded guilty to Count One of the Indictment, which charges:

> From at least in or about 2015 through at least in or about 2017, in the Southern District of New York and elsewhere, EZRA CHOWAIKI, the defendant, willfully and knowingly, having devised a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, CHOWAIKI, through the use of e-mail messages, telephone calls, and electronic fund transfers, defrauded purchasers and sellers of fine art by deceiving them into sending funds or artwork to his gallery in New York, New York under the false pretenses that CHOWAIKI would either use the funds to purchase works of art or that he would sell the artworks that had been provided to him.

(*Id.* at ¶ 100 (quoting Criminal Case, Dkt. #14)).

Ultimately, as part of Chowaiki's guilty plea and resulting conviction,

Chowaiki admitted to the forfeiture of at least 26 works of art that he had

stolen or otherwise fraudulently acquired (including the Picasso), worth over

$16.6 million, and agreed to make restitution to his victims.  (Compl. ¶ 101

(citing Criminal Case, Dkt. #16)).  In the Criminal Case, the court adjudged

Plaintiff's right to the Picasso to be superior to that of the Bankruptcy Case

Trustee and the United States.  (*Id.* at ¶ 102).  Plaintiff alleges that no other

party, including Piedmont, filed a petition with respect to the Picasso.  (*Id.*).

Plaintiff also cites limited information from the Bankruptcy Case.

Plaintiff notes that, in the Bankruptcy Case, there were 69 claims filed against

12

the Gallery, totaling $56,249,794.49.  (Compl. ¶ 103).  Plaintiff alleges that almost all of those claims were made by claimants who had given Chowaiki money or art, only to have him convert the money or art for his own use.  (*Id.*).

## B.   Procedural Background

Plaintiff filed the Complaint on April 8, 2019.  (Dkt. #1).  On June 10, 2019, Defendants DBFA, David Benrimon, Linda Benrimon, Alex Benrimon, Lauren Benrimon, Piedmont, and Avichai Rosen filed a letter requesting a pre-motion conference for their proposed motion to dismiss under Rule 12(b)(6). (Dkt. #14).  The same day, Chowaiki also filed a letter requesting a pre-motion conference for his proposed motion to dismiss.  (Dkt. #17).  Also on the same day, Plaintiff filed a letter in response to the two letters.  (Dkt. #18).  On June 11, 2019, the Benrimon Defendants filed a letter requesting a pre-motion conference before moving for sanctions pursuant to Fed. R. Civ. P. 11 against Plaintiff and his counsel.  (Dkt. #21).  On June 14, 2019, Plaintiff filed a letter opposing the substance of the Benrimon Defendants' letter.  (Dkt. #22).

The Court held a pre-motion conference on July 29, 2019, at which time the Court heard arguments from all parties on the Defendants' proposed motions and Plaintiff's proposed amended complaint.  (Dkt. #27 ("July 29, 2019 Tr.")).  On September 6, 2019, Plaintiff voluntarily dismissed Defendants Alex Benrimon and Lauren Benrimon from the action.  (Dkt. #25).  Plaintiff filed an amended complaint (the "Complaint") the same day.  (Dkt. #26).

The Complaint alleges the following causes of action:

(i)     a RICO claim against David and Linda Benrimon for engaging in pattern of racketeering activity through DBFA;

(ii)    a RICO conspiracy claim against David and Linda Benrimon, Rosen, Chowaiki, and Piedmont for facilitating the RICO violations in Count I;

(iii)   a RICO claim against Rosen for the collection of unlawful debt through Piedmont;

(iv)    a RICO conspiracy claim against David and Linda Benrimon, DBFA, Rosen, and Chowaiki for facilitating the RICO violations in Count III;

(v)     a RICO claim against David and Linda Benrimon for collection of unlawful debt through DBFA;

(vi)    a RICO conspiracy claim against David and Linda Benrimon, Rosen, Chowaiki and Piedmont for facilitating the RICO violations in Count V;

(vii)   a RICO claim against Chowaiki for a pattern of racketeering activity;

(viii)  a RICO conspiracy claim against all of the Defendants for facilitating the RICO violations in Count VII;

(ix)    a common-law fraud claim against Chowaiki and conspiracy to defraud claim against all the Benrimon Defendants;

(x)     a conversion claim against all of the Defendants for Plaintiff's loss of the Picasso and a conspiracy to convert claim against all of the Defendants for Plaintiff's loss of the Leger; and

(xi)    a replevin claim against all of the Defendants for Plaintiff's Leger.

(Compl. ¶¶ 112-53).

On October 18, 2019, Chowaiki filed his motion to dismiss.  (Dkt. #29-31).  The Benrimon Defendants filed their motion to dismiss on October 21,

14

2019.  (Dkt. #32-34).  The Benrimon Defendants filed their motion for sanctions the same day.  (Dkt. #35-38).  On November 18, 2019, Plaintiff filed a brief and declaration in opposition to both Chowaiki's and the Benrimon Defendants' motions to dismiss.  (Dkt. #39-40).  Plaintiff also filed a brief and declaration in opposition to the Benrimon Defendants' motion for sanctions. (Dkt. #41-42).  Chowaiki filed his reply brief on December 6, 2019.  (Dkt. #45). That same day, the Benrimon Defendants filed their replies in support of both their motion to dismiss and motion for sanctions.  (Dkt. #46-48).  On December 13, 2019, Plaintiff requested oral argument on the motions.  (Dkt. #49).  The Court has reviewed the motions and, for the reasons explained below, does not believe that oral argument would be useful.

## DISCUSSION

### A. Plaintiff Has Failed to Allege a Civil RICO Claim Against Any of the Defendants

#### 1. Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

A complaint survives a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 554, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

The heightened pleading standard specified in *Twombly* "require[s] enough facts to nudge [the plaintiff's] claims across the line from conceivable to

15

plausible." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (citing *Twombly*, 550 U.S. at 570).  While a court should accept plaintiff's allegations from the complaint as true, it need not follow that course for any of plaintiff's legal conclusions.  *See Iqbal*, 556 U.S. at 678.  Legal conclusions that are stated to support "[t]hreadbare recitals of the elements of a cause of action ... do not suffice."  *Id.*  Therefore, a court is entitled to dismiss a complaint under Rule 12(b)(6) if the plaintiff merely offers "labels and conclusions or a formulaic recitation of the elements of a cause of action."  *Am. Fed'n of State, Cty. & Mun. Emp. Dist. Council 37 Health & Sec. Plan* v. *Bristol-Myers Squibb Co.*, 948 F. Supp. 2d 338, 344 (S.D.N.Y. 2013) (citing *Iqbal*, 556 U.S. at 678).

In resolving a Rule 12(b)(6) motion, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (collecting cases).  A court may also consider "matters as to which judicial notice may be taken, such as pleadings in other lawsuits and other public records[.]"  *Rosado-Acha* v. *Red Bull Gmbh*, No. 15 Civ. 7620 (KPF), 2016 WL 3636672, at *6 (S.D.N.Y. June 29, 2016) (quoting *Agron* v. *Douglas W. Dunham, Esq. & Assocs.*, No. 02 Civ. 10071 (LAP), 2004 WL 691682, at *2 (S.D.N.Y. Mar. 31, 2004)) (internal quotation marks omitted); *see also Pani* v. *Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule

16

12(b)(6)."); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016) (discussing documents that may properly be considered in resolving a Rule 12(b)(6) motion).

More specifically, "[i]n the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice*." *Jianjun Lou* v. *Trutex, Inc.*, 872 F. Supp. 2d 344, 350 n.6 (S.D.N.Y. 2012); *see also Rothman* v. *Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of pleading in another lawsuit). The Court may take judicial notice of a document filed in another court to establish the fact of such litigation and related filings, but not for the truth of the matters asserted in the other litigation. *Glob. Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (internal quotation marks and citation omitted); *accord In re Ridgemour Meyer Properties, LLC*, 599 B.R. 215, 220 (S.D.N.Y. 2019), *aff'd*, 791 F. App'x 279 (2d Cir. 2020) (summary order).

### 2. Pleading a Civil Action Under RICO

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d) applies the same prohibitions to a defendant who conspires to violate subsection (c). Of particular significance here, RICO affords a private right of action to individuals who are harmed by

racketeering activity.  *See* 18 U.S.C. § 1964.  This private right of action allows a plaintiff to bring a claim under RICO for sustaining injuries "in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  A plaintiff who proves injuries in his business or property may "recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"  *Id.*  A plaintiff bringing a civil RICO claim under Section 1962(c) must allege that: (i) the defendant has violated the substantive RICO statute; and (ii) the plaintiff was injured in his business or property "by reason of a violation of section 1962."  *Moss* v. *Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(c)); *accord Spool* v. *World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).  To make out a substantive RICO violation, in turn, a plaintiff must allege the (i) conduct (ii) of an enterprise (iii) through a pattern (iv) of racketeering activity.  *Sedima, S.P.R.L.* v. *Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

To establish a RICO conspiracy under 18 U.S.C. § 1962(d), a plaintiff must allege "a conspiracy to commit a substantive RICO violation."  *Spool*, 520 F.3d at 183.  "Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement."  *Hecht* v. *Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990).  To make out a RICO conspiracy charge, under § 1962(d), a plaintiff must allege that the conspirator intended to further an endeavor that, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that the conspirator has adopted

the goal of furthering or facilitating the criminal endeavor.  *First Capital Asset Mgmt. Inc.* v. *Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) (quoting *Baisch* v. *Gallina*, 346 F.3d 366, 376-77 (2d Cir. 2003)).  In the civil context, a plaintiff must allege that the defendant "knew about and agreed to facilitate the scheme."  *Salinas* v. *United States*, 522 U.S. 52, 66 (1997); *accord City of New York* v. *Bello*, 579 F. App'x 15, 17 (2d Cir. 2014) (summary order).

### a.    The RICO Enterprise Requirement

An "enterprise" within the meaning of the RICO statute includes any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  An enterprise is proven by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *United States* v. *Turkette*, 452 U.S. 576, 583 (1981).

A RICO enterprise must be "an entity separate and apart from the pattern of activity in which it engages."  *Turkette*, 452 U.S. at 583.  As the Second Circuit has "long recognized, the plain language and purpose of the statute contemplate that a person violates the statute by conducting an enterprise through a pattern of criminality.  It thus follows that a corporate person cannot violate the statute by corrupting itself."  *Cruz* v. *FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citing *Bennett* v. *U.S. Tr. Co. of N.Y.,* 770 F.2d 308, 315 (2d Cir. 1985)).  Rather, a plaintiff bringing a RICO claim must allege the existence of two distinct entities — a person and an enterprise.  *See*

*id.* (quoting *City of New York* v. *Smokes-Spirits.com, Inc.*, 541 F.3d 425, 438 n.15 (2d Cir. 2008)).

### b.    The Pattern Requirement

A "pattern of racketeering activity" requires at least two acts of "racketeering activity" occurring within 10 years of each other.  *See* 18 U.S.C. § 1961(5); *accord Spool*, 520 F.3d at 183.  The term "racketeering activity" refers to the predicate acts necessary to sustain a RICO claim and includes mail fraud and wire fraud.  *See* 18 U.S.C. § 1961(1).  In order to constitute a "pattern" of racketeering activity, the predicate acts must be [i] related and [ii] constitute a threat of continued racketeering activity."  *H.J. Inc., et al.* v. *Northwestern Bell Tel. Co.*, 492 U.S. 229, 238-44 (1989); *accord United States* v. *Alkins*, 925 F.2d 541, 551 (2d Cir. 1991).

### i.    Relatedness

Predicate crimes must be related both to each other ("horizontal relatedness") and to the enterprise as a whole ("vertical relatedness").  *See Reich* v. *Lopez*, 858 F.3d 55, 60 (2d Cir. 2017) (citing *United States* v. *Cain*, 671 F.3d 271, 284 (2d Cir. 2012)).  "Vertical relatedness, which entails the simpler analysis, requires only 'that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise.'"  *Reich*, 858 F.3d at 61 (quoting *United States* v. *Burden*, 600 F.3d 204, 216 (2d Cir. 2010)).

20

"[P]redicate acts are horizontally related when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Reich*, 858 F.3d at 61 (emphasis in original) (quoting *H.J.*, 492 U.S. at 240). "When dealing with 'an enterprise whose business is racketeering activity, such as an organized crime family,' horizontal relatedness can be established simply by linking each act to the enterprise." *Id.* (quoting *United States* v. *Coppola*, 671 F.3d 220, 243 (2d Cir. 2012) (internal punctuation and citations omitted)). "When dealing with an enterprise that is primarily a legitimate business, however, courts must determine whether there is a relationship between the predicate crimes themselves; and that requires a look at, *inter alia*, whether the crimes share 'purposes, results, participants, victims, or methods of commission.'" *Id.* (quoting *H.J.*, 492 U.S. at 240). "[T]he overall pattern requirement, of which relatedness is one component, is a bulwark against the application of RICO to the perpetrators of isolated or sporadic criminal acts." *United States* v. *Daidone,* 471 F.3d 371, 376 (2d Cir. 2006).

### ii.    Continuity

To satisfy continuity, the plaintiff must establish either "a series of related predicate acts extending over a substantial period of time" ("closed-ended continuity") or "a threat of continuing criminal activity" ("open-ended continuity"). *Cofacredit, S.A.* v. *Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). "RICO targets conduct that 'amounts to or poses a threat of continued criminal activity.'" *Reich*, 858 F.3d at 60 (alterations omitted)

(quoting *H.J.*, 492 U.S. at 239).  "Such continuity can be closed-ended or open-ended."  *Id.*  "Criminal activity that occurred over a long period of time in the past has closed-ended continuity, regardless of whether it may extend into the future."  *Reich*, 858 F.3d at 60.  "As such, closed-ended continuity is 'primarily a temporal concept'" *id.* (quoting *Spool*, 520 F.3d at 184), "and it requires that the predicate crimes extend 'over a substantial period of time'" *id.* (quoting *H.J.*, 492 U.S. at 242).  The Second Circuit "generally requires that the crimes extend over at least two years."  *Id.* (citing *Spool*, 520 F.3d at 184 ("Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity[.]")).

"On the other hand, criminal activity 'that by its nature projects into the future with a threat of repetition' possesses open-ended continuity, and that can be established in several ways."  *Reich*, 858 F.3d at 60 (quoting *H.J.*, 492 U.S. at 241).  When, for example, "the business of an enterprise is primarily unlawful, the continuity of the enterprise itself projects criminal activity into the future."  *Id.* (citing *Spool*, 520 F.3d at 185).  "And similarly, criminal activity is continuous when 'the predicate acts were the regular way of operating that business,' even if the business itself is primarily lawful."  *Id.* (quoting *Cofacredit*, 187 F.3d at 243).

### c.    The Racketeering Activity Requirement

"Racketeering activity" is defined in 18 U.S.C. § 1961(1) to include a variety of offenses including, as relevant here, mail fraud under 18 U.S.C.

§ 1341; wire fraud under 18 U.S.C. § 1343; interstate transportation of stolen property under 18 U.S.C. §§ 2314 and 2315; and money laundering under 18 U.S.C. §§ 1956 and 1957.  *See* 18 U.S.C. § 1961(1).

### i.   Mail and Wire Fraud

The "essential elements of [mail and wire fraud] are [i] a scheme to defraud, [ii] money or property as the object of the scheme, and [iii] use of the mails or wires to further the scheme." *United States* v. *Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curiam) (first alteration in original) (internal quotation mark omitted) (quoting *United States* v. *Binday*, 804 F.3d 558, 569 (2d Cir. 2015)).  "Because the mail fraud and the wire fraud statutes use the same relevant language, [courts] analyze them the same way." *Id.* (internal quotation marks omitted) (quoting *United States* v. *Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016)).

"[T]he gravamen of the offense is the scheme to defraud." *Weaver*, 860 F.3d at 94 (alteration in original) (internal quotation marks omitted) (quoting *Greenberg*, 835 F.3d at 305).  "In order to prove the existence of a scheme to defraud, [a party must prove both] 'that the misrepresentations were material' ... and that the defendant acted with fraudulent intent." *Id.* (quoting *United States ex rel. O'Donnell* v. *Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016)) (citing *Greenberg*, 835 F.3d at 305-06).

Claims for mail and wire fraud are subject to the heightened pleading standards of Rule 9(b), which requires that averments of fraud be stated with particularity.  *See Cohen* v. *S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir.

2013).  "To satisfy this requirement, a complaint must 'specify the time, place, speaker, and content of the alleged misrepresentations,' 'explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'"  *Id.* (quoting *Caputo* v. *Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (alteration in original) (internal quotation marks omitted)); *accord Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) (holding that allegations of predicate wire fraud must "state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent.").  This standard applies to all allegations of fraudulent predicate acts supporting a RICO claim.  *First Capital*, 385 F.3d at 178-79.

### ii.    Transportation and Receipt of Stolen Property

Section 2314 prohibits, among other things, the interstate or foreign transportation of stolen goods valued at $5,000 or more.  18 U.S.C. § 2314. The elements of such offense are: (i) the defendant transported property, as defined by the statute, in interstate or foreign commerce; (ii) the property was worth $5,000 or more; and (iii) the defendant knew the property was stolen, converted, or taken by fraud.  *United States* v. *Wallach*, 935 F.2d 445, 466 (2d Cir. 1991).  The definition of fraud in § 2314 is generally the same as under the mail and wire fraud statutes.  *Id.*  Where allegations of interstate or foreign transport of stolen property allege that the property has been taken by fraud, the allegations must meet the heightened requirement of Rule 9(b).  *See Kades*

v. *Organic Inc.*, No. 00 Civ. 3671 (LTS) (RLE), 2003 WL 470331, at *9 (S.D.N.Y. Feb. 24, 2003) (noting that allegations of transportation of stolen property, mail fraud, and wire fraud must be pleaded with particularity); *Philan Ins. Ltd.* v. *Hall*, 748 F. Supp. 190, 195 (S.D.N.Y. 1990) (dismissing a RICO claim based on transportation of stolen property, mail fraud, and wire fraud where plaintiffs did not plead each of the elements of these acts with sufficient particularity "to withstand a motion to dismiss under Rules 12(b)(6) and 9(b)").

Section 2315 prohibits the knowing receipt, sale, concealment, possession, or disposition of stolen goods that have been transported interstate or abroad after being stolen, unlawfully converted, or taken.  18 U.S.C. § 2315. To prove a violation of § 2315, a plaintiff must establish that the goods received had been stolen, that the goods had a value of at least $5,000, that the goods were "moving as," were "part of," or "constituted" interstate or foreign commerce, and that the defendant knew the goods had been stolen.  *See United States* v. *Tashjian*, 660 F.2d 829, 839 (1st Cir. 1981), *cert. denied*, 454 U.S. 1102 (1981); *accord United States* v. *Kapelioujnyj*, 547 F.3d 149, 153 (2d Cir. 2008).

### iii.   Money Laundering

To establish a violation of the money laundering statute, 18 U.S.C. § 1956, a plaintiff must first show "[i] that the defendant conducted a financial transaction; [ii] that the transaction in fact involved the proceeds of specified unlawful activity as defined in § 1956(c)(7); [and] [iii] that the defendant knew that the property involved in the financial transaction represented the proceeds

of some form of unlawful activity." *United States* v. *Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997).  The plaintiff must then make one of two additional showings: (a) that the defendant knew "the transaction was designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(B)(i); or (b) that the defendant conducted or attempted to conduct the transaction "with the intent to promote the carrying on of specified unlawful activity," *id.* § 1956(a)(1)(A)(i).  A plaintiff need not allege money laundering with great particularity, but the plaintiff must plead all elements of the offense.  *Tymoshenko* v. *Firtash*, 57 F. Supp. 3d 311, 322-23 (S.D.N.Y. 2014).

### d.    The Domestic Injury Requirement

In addition to establishing the preceding elements, a plaintiff seeking to allege a civil RICO violation must also adequately plead a "domestic injury." *See RJR Nabisco, Inc.* v. *European Community*, 136 S. Ct. 2090, 2111 (2016); *cf. City of Almaty, Kazakhstan* v. *Ablyazov*, 226 F. Supp. 3d 272, 281 (S.D.N.Y. 2016) ("*RJR Nabisco* makes clear that domestic injury to business or property is an independent requirement for bringing a private RICO action — separate and apart from the requirement of a substantive RICO violation that is either domestic or permissibly extraterritorial[.]" (internal quotation marks omitted)), *motion to certify appeal denied*, No. 15 Civ. 5345 (AJN), 2017 WL 1424326 (S.D.N.Y. Apr. 20, 2017).  After the Supreme Court's decision in *RJR Nabisco*, putative RICO violations are construed narrowly to adhere to the well-

established presumption against extraterritoriality.  *RJR Nabisco, Inc.*, 136 S. Ct. at 2108.  This presumption holds that "federal laws will be construed to only have domestic application."  *Id.* at 2100.

While establishing the requirement of "domestic injury" in *RJR Nabisco*, the Supreme Court left open the question of determining what constitutes a domestic injury, a question taken up by the Second Circuit in *Bascuñán* v. *Elasca*, 874 F.3d 806 (2d Cir. 2017).  There, the Court stated explicitly that "a foreign resident may … allege a civil RICO injury that is domestic."  *Id.* at 814. The Court explained that, "[a]t a minimum, when a foreign plaintiff maintains tangible property in the United States, the misappropriation of that property constitutes a domestic injury."  *Id.*  The Court explained, however, that application of the domestic injury rule in any given context will, as a general matter, "depend on the particular facts alleged in each case" and "if a plaintiff alleges more than one injury, courts should separately analyze each injury to determine whether any of the injuries alleged are domestic."  *Id.* at 818.  The Court later "conclude[d] that an injury to tangible property is generally a domestic injury only if the property was physically located in the United States, and that a defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one."  *Id.* at 819.  On the other hand, an "injury is domestic if the plaintiff's property was located in the United States when it was stolen or harmed, even if the plaintiff himself resides abroad."  *Id.* at 820-21.

**B.     Analysis**

The Complaint in this case is both disjointed and replete with conclusory allegations.  The Court has carefully reviewed Plaintiff's allegations to separate the wheat from the chaff and, in the remainder of this section, analyzes only those allegations that are well-pleaded.

> **1.     The Court Dismisses Plaintiff's Substantive RICO Claim Against David and Linda Benrimon (Count I) and Plaintiff's RICO Conspiracy Claim Against David and Linda Benrimon, Rosen, Piedmont, and Chowaiki (Count II)**

In his brief in opposition to the motions to dismiss, Plaintiff clarifies that his RICO claims against David and Linda Benrimon are as follows: the Benrimons managed and conducted the affairs of their gallery (and RICO enterprise) DBFA through a pattern of racketeering activity that included unlawfully or fraudulently selling artwork that they had no right to sell.  (*See* Pl. Opp. 15-16).  Plaintiff states that the predicate racketeering acts include the transportation and/or receipt of stolen property, money laundering, wire fraud, mail fraud, fraud in a bankruptcy proceeding, and fraudulent filings in this court.  (*See id.* at 16).

Plaintiff argues that this racketeering activity began no later than February 2, 2012, when David and Linda Benrimon, or a company they controlled or owned, purported to sell an Andy Warhol painting and ten Warhol prints to Marc Latamie and DM for $1,750,000, and then, instead of delivering the prints, unlawfully sold (or attempted to sell) them through DBFA to others (*i.e.*, the Latamie Acts).  (*See* Pl. Opp. 16).  He claims that the racketeering activity continued when David and Linda Benrimon purchased *Le Compotier* by

28

Juan Gris for DBFA with full knowledge that Chowaiki had no right to sell or dispose of that work, and that its owner had requested its return (*i.e.*, the *Le Compotier* Acts). (*Id.*). And Plaintiff claims the racketeering activity continued further when David and Linda Benrimon, in the conduct of DBFA's business, negotiated with Chowaiki and his Gallery to acquire additional works of art at a sizable (and, Plaintiff claims, telltale) discount. (*Id.*). They did so by structuring the $300,000 loan from Piedmont to Chowaiki secured by three artworks (the Picasso, the Murakami, and *Le Clown*) (*i.e.*, the Pledge Agreement Acts). (*Id.* at 16-17). Thereafter, David and Linda Benrimon took delivery of the Picasso at DBFA; deleted the Picasso's Provenance, which showed Plaintiff as the artwork's owner; and shipped the stolen Picasso to Milan, where they sold it for $441,000. (*Id.* at 17). Finally, Plaintiff alleges that David and Linda Benrimon's racketeering activity continued as they concealed their role in the loan transaction by having Piedmont make numerous false filings in the Bankruptcy and Criminal Cases (*i.e.*, the Court Filing Fraud). (*Id.*).

### a.   Plaintiff Has Failed to Plead a "Pattern of Racketeering Activity"

Even accepting Plaintiff's clarification, the Court concludes that the predicate acts here are far too disparate and inadequately pleaded to constitute a pattern of racketeering activity. To begin, the Latamie Acts are not horizontally related to the other predicate acts. "[P]redicate acts are horizontally related when they: have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Reich*, 858 F.3d

29

at 61 (citation omitted).  Plaintiff gestures at relatedness by asserting that the Latamie Acts had the "same purpose and function: to fraudulently sell and profit from other people's art-work and to conceal what was done."  (Pl. Opp. 18).  But Plaintiff fails to show, with the requisite specificity, just how the Latamie Acts relate to the other alleged predicate acts.

In point of fact, Plaintiff cannot make such a showing.  The gravamen of the Latamie Acts is that a subset of the Defendants here (DBFA, David and Linda Benrimon) and "other members of the Benrimon family" (Leon Benrimon), along with Leon Benrimon's art gallery, Benrimon Contemporary LLC, failed to deliver artworks that either DBFA or Benrimon Contemporary LLC had sold to a *bona fide* purchaser.  (*See* Compl. ¶¶ 24-27).[4]  The alleged fraudulent sale at the center of the Latamie Acts occurred at least five years before the alleged predicate acts in the other three groups.  The Latamie Acts also had nothing to do with Plaintiff and were directed instead at other alleged

---

[4]     Plaintiff contends that "the common purpose of all these Racketeering Activities is not changed by the fact that Mr. Benrimon's son (Ms. Benrimon's brother, Mr. Rosen's brother-in-law), was involved in yet another art gallery, allegedly acting as a front to help the Benrimons' gallery profit from selling art which was sold to others."  (Pl. Opp. 19).  But it *does* matter to the Court's analysis that the Latamie Acts involved a different group of players from the ones at the heart of Plaintiff's RICO claims in this Complaint because "no RICO violation can be shown unless there is proof of the specified relationship between the racketeering acts and the RICO enterprise."  *United States* v. *Indelicato*, 865 F.2d 1370, 1384 (2d Cir. 1989); *see Sedima, S.P.R.L.* v. *Imrex Co.*, 473 U.S. 479 (1985).  While the "enterprise" and "pattern of racketeering activity" are distinct elements of a RICO case, the existence of different players changes the mode of commission of the predicate activity.

And though not part of its analysis, the Court observes that in the proceeding brought by Marc Latamie against Benrimon Contemporary LLC, upon which Plaintiff bases his allegations, the court found that the plaintiff there "ha[d] not uncovered any evidence to support his" theory that David Benrimon was the alter ego of Benrimon Contemporary LLC.  (Dkt. #34, Nikas Decl., Ex. A).

victims.  And, most notably, the Latamie Acts had no connection to Chowaiki or the Gallery, and no connection to Rosen or Piedmont.  In sum, Plaintiff fails to connect the Latamie Acts to the remainder of the alleged pattern of racketeering activity.

Further, to the extent Plaintiff alleges that the Latamie Acts constitute wire fraud, in violation of 18 U.S.C. § 1343 (*see* Compl. ¶ 26), he fails to meet the heightened pleading standards required by Rule 9(b).  Plaintiff merely states that "[u]pon information and belief, and as further to be determined in discovery, during the [Latamie Acts] transaction, the purchasers of the Warhol, at all times negotiated with, *inter alia,* David and Linda Benrimon, and other members of the Benrimon family" (*id.* at ¶ 25); and that "David and Linda Benrimon, directly or at their instruction, by wire, telephone, and in person, continued to falsely, and fraudulently, and repeatedly promise Mr. Latamie and DM, that they (the Benrimons) would deliver the Warhol prints to the purchasers" (*id.* at ¶ 26).  Plaintiff's conclusory assertions fail to explain the "the time, place, speaker, and content of the alleged misrepresentations" *Cohen*, 711 F.3d at 359, and Plaintiff fails to explain the "information and belief" upon which his allegations are founded, *see Pilkington North Am., Inc.* v. *Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp. 3d 123, 142-43 (S.D.N.Y. 2019).  For these reasons as well, Plaintiff fails to plead the Latamie Acts as predicate RICO acts.

The Court next considers whether the Court Filing Acts constitute part of David and Linda Benrimon's alleged pattern of racketeering activity.  At the

outset, the parties dispute the antecedent issue of whether the Court Filing

Acts could qualify as predicate acts for RICO purposes.  The Benrimon

Defendants cite *Kim* v. *Kimm*, 884 F.3d 98, 104 (2d Cir. 2018), in support of

their argument that these acts cannot serve as predicate acts.  In *Kim*, the

plaintiff purported to allege various predicate acts of mail fraud, wire fraud,

and obstruction of justice, allegedly committed by the defendants, citing

declarations that were prepared, signed, and filed by defendants with full

knowledge that they contained fraudulent representations intended to

persuade the district court to find in their favor in a separate trademark and

breach of contract dispute.  *Id.* at 103.

The district court concluded that these litigation activities could not

provide the basis for predicate acts under § 1962(c).  884 F.3d at 103-04.  The

Second Circuit agreed, reasoning as follows:

> Although we have not spoken directly on the issue,
> other courts have held that "[i]n the absence of
> corruption," such litigation activity "cannot act as a
> predicate offense for a civil-RICO claim." *Snow
> Ingredients, Inc.* v. *SnoWizard, Inc.*, 833 F.3d 512, 525
> (5th Cir. 2016); *Raney* v. *Allstate Ins. Co.*, 370 F.3d
> 1086, 1087-88 (11th Cir. 2004) (deciding that the
> "alleged conspiracy to extort money through the filing of
> malicious lawsuits" were not predicate acts of extortion
> or mail fraud under RICO); *Deck* v. *Engineered
> Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003)
> (deciding that meritless litigation is not a predicate act
> of extortion under RICO); *Gabovitch* v. *Shear*, 70 F.3d
> 1252 (table), 1995 WL 697319, at *2, 1995 U.S. App.
> LEXIS 32856 (1st Cir. 1995) (per curiam) (concluding
> that "proffering false affidavits and testimony to [a] state
> court" does not constitute a predicate act of extortion or
> mail fraud); *see also Curtis & Assocs., P.C.* v. *Law
> Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153,

> 171-72 (E.D.N.Y. 2010) (collecting cases from district courts in the Second Circuit deciding "that the litigation activities alleged in [the complaint before the court] cannot properly form the basis for RICO predicate acts"). We agree with the reasoning of these opinions and conclude that allegations of frivolous, fraudulent, or baseless litigation activities — without more — cannot constitute a RICO predicate act.

*Id.* at 104 (alterations in original). The Benrimon Defendants argue that *Kim* forecloses Plaintiff from relying on the Court Filing Acts as predicate acts for their RICO claims.

Plaintiff responds that *Kim* is inapposite because, in that case, the Second Circuit explicitly distinguished a district court case relied on by the plaintiff, *Sykes* v. *Mel Harris and Associates, LLC*, 757 F. Supp. 2d 413 (S.D.N.Y. 2010), where "the district court denied the defendants' motion to dismiss the plaintiffs' section 1962(c) claims, observing that the plaintiff pleaded a pattern of racketeering activity that included at least twenty allegedly fraudulent statements and eighteen acts involving use of the mail or wires over three years, in furtherance of the alleged fraud." *Id.* at 105 (internal quotations omitted). To a degree, Plaintiff is correct: The *Kim* Court did distinguish *Sykes* by explaining that "even though the defendants [in *Sykes*] used litigation to carry out their scheme, they also engaged in a variety of other out-of-court actions to further this activity .... [while] in the case at bar, by contrast, the entire alleged scheme involved the creation of fraudulent court documents." *Id.* But the *Kim* Court "decline[d] to reach the issue of whether all RICO actions based on litigation activity are categorically meritless," and limited its holding

to "conclude only that where … a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act." *Id.* Accordingly, Plaintiff contends that because the Court Filing Acts are not the only RICO violation alleged — and because "the pattern is the fraudulent selling, and profiting from other people's art-work, and concealing what was done" (Pl. Opp. 20) — the Court may consider the Court Filing Acts as predicate acts of wire and mail fraud (*id.* & n.3).

The Court need not resolve whether the Court Filing Acts could qualify as predicate RICO acts because, even if they could, they have not been properly pleaded here. The specific acts Plaintiff alleges in the Complaint are that David and Linda Benrimon caused numerous electronic filings to be made in the Bankruptcy Case and Criminal Case in which Piedmont asserted ownership of the Murakami and *Le Clown*. Plaintiff claims that those filings were fraudulent because: (i) they did not disclose the role or name of the real acquirers/purchasers, *i.e.*, David and Linda Benrimon and DBFA (Compl. ¶ 73); and (ii) Piedmont's petition in the Criminal Case did not disclose the existence of the Shtar Isko (*id.* at ¶ 76). Plaintiff further asserts that

> [t]he filings were each fraudulent and each was designed to deceive plaintiff, other owners of works of art, the creditors of Mr. Chowaiki's Gallery, the victims of Chowaiki's crimes, the Trustee in the Bankruptcy [C]ase, the courts, and law enforcement officials into believing that David and Linda Benrimon and David Benrimon Fine Art LLC had nothing to do with these fraudulent transactions[.]

34

(*Id.* at ¶ 74).  In his brief in opposition to the motions to dismiss, Plaintiff adds that the "fraudulent filings conceal the fact that the $300,000.00 loan was not merely a loan, but was a device to conceal the fact that the Benrimon [D]efendants (and not Piedmont alone) knowingly were acquiring, at a steep discount, fraudulently obtained art belonging to other people and selling it for their own benefit and concealing what they were doing." (Pl. Opp. 20-21).

Despite the sweeping language, Plaintiff provides little in the way of support for his contention that these filings were indeed fraudulent.  As it is permitted to do, the Court has reviewed the allegedly fraudulent filings incorporated by reference in the Complaint.  The Bankruptcy Case filings consist of (i) a proof of claim filed by Piedmont reciting Piedmont as the owner of the Murakami and *Le Clown* pursuant to the Release and Settlement Agreement between Piedmont and the Gallery (Bankruptcy Case, Claims 62, 63 (the "Piedmont Petition")), and (ii) a stipulation between the Bankruptcy Trustee and Piedmont, by which Piedmont agreed that "'the Neumans [who Plaintiff contends are the lawful owners of *Le Clown*] would have right, title and interest in *Le Clown* … and Piedmont further agreed to withdraw the Piedmont Petition" (*id.* at Dkt. #174 (the "Stipulation")).[5]

With respect to the Criminal Case, Plaintiff cites to Piedmont's petition in the district court asserting its interest as claimant in the Murakami and *Le Clown.* (Criminal Case, Dkt. #57).  The remainder of Plaintiff's citations to the

---

[5]    The Court notes that the Stipulation was filed by the Bankruptcy Trustee, not Piedmont.  (*See* Bankruptcy Case, Dkt. #174).

Criminal Case docket are to Piedmont's opposition to the Government's motion to dismiss its petition (*id.* at Dkt. #98); the oral argument held on the motion (*id.* at Dkt. #114 (transcript)); and Judge Rakoff's decision in that case, concluding, under New York property law and at the motion to dismiss stage, that Piedmont had acquired a legal interest in *Le Clown* as a *bona fide* purchaser for value (*id.* at Dkt. #119).  A review of those documents reveals that Piedmont relied on the transaction documents — the pledge agreement documents and the later settlement agreement with the Gallery — to substantiate its interest in the relevant artwork.  The Court cannot infer fraudulent intent on the part of Piedmont, let alone the remaining Benrimon Defendants, from Piedmont asserting an ownership interest in the artwork consistent with the loan transaction documents.

And despite Plaintiff's contention otherwise, the docket in the Criminal Case reveals that Piedmont *did* disclose the existence of the Shtar Isko.  When Piedmont filed its petition for the Picasso in the Criminal Case, it included as an exhibit the Note between Piedmont and Chowaiki.  (*See* Criminal Case, Dkt. #57).  The Note explicitly states that the Gallery "shall pay, in accordance with Heter Iska, all outstanding principal to" to Piedmont.  (*Id.* at Ex. A). Accordingly, Plaintiff's claim that the Benrimons defrauded the court by having Piedmont keep the existence of the Shtar Isko undisclosed, is belied by the public record in the Criminal Case of which the Court takes judicial notice.[6]

---

[6]     Those courts that have considered the issue have concluded uniformly that a Shtar Isko does not create a legally enforceable partnership.  *See Madison Park,* 2015 WL 471786,

36

Further, Plaintiff cites nothing to suggest that David and Linda Benrimon had any duty to disclose their involvement with the artwork.  Given that Piedmont was the entity with the right to the artwork, it is far from clear that David and Linda Benrimon would be obligated to disclose their affiliations with Piedmont.  Since Plaintiff has failed to allege or show that David and Linda Benrimon had a duty to disclose anything to the bankruptcy and criminal courts, Plaintiff's claim for fraud fails.  *See United States* v. *Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) ("[A]n omission can violate the fraud statute only in the context of a duty to disclose[.]"); *Odyssey Re (London) Ltd.* v. *Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 296 (S.D.N.Y. 2000) ("In case of fraud resting on an alleged omission, plaintiff must allege facts giving rise to a duty to disclose.").  Thus, Plaintiff has failed to plead the Court Filing Acts as predicate acts.

Having rejected two putative categories of racketeering acts, the Court is left to consider whether the *Le Compotier* Acts and the Pledge Agreement Acts constitute a pattern of racketeering activity.  Put simply, these two sets of Acts do not a pattern of racketeering activity make.[7]  Plaintiff has at best pleaded

---

at *10 n.3 (collecting cases); *Edelkind* v. *Fairmont Funding, Ltd.*, 539 F. Supp. 2d 449, 454 (D. Mass. Mar. 6, 2008) (collecting cases).

[7]     *See Sedima,* 473 U.S. at 496 n.14:

> [T]he definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern "*requires* at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts.  The implication is that while two acts are necessary, they may not be sufficient.  Indeed, in common parlance two of anything do not generally form a "pattern."

37

that on two instances, David and Linda Benrimon acquired artwork from either Chowaiki or the Gallery, knowing that neither Chowaiki nor the Gallery had the lawful ability to transfer it.

Plaintiff has demonstrated neither closed-ended nor open-ended continuity sufficient to satisfy the pattern requirement for racketeering activity. The *Le Compotier* Acts and the Pledge Agreement Acts are alleged to have occurred between "the summer of 2017" and May 2018.  (Compl. ¶¶ 29, 67-68). But the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time.'"  *Spool*, 520 F.3d at 184 (quoting *Cofacredit*, 187 F.3d at 242); *see Ramiro Aviles* v. *S & P Glob. Inc.*, 380 F. Supp. 3d 221, 269 (S.D.N.Y. 2019) (noting that "two years may be the *minimum* duration necessary to find closed-ended continuity" (quotation omitted)). Because the putative predicate acts spanned less than a year's time, they do not satisfy the requirements of closed-ended continuity.

Plaintiff has likewise failed to demonstrate open-ended continuity, because there is no allegation that David and Linda Benrimon's "regular way of operating" DBFA involved retaining artwork after being informed that the individual from whom they purchased the artwork had no right to sell it; obtaining artwork as collateral on fraudulent loans; or falsifying chain of ownership records.  *See Reich*, 858 F.3d at 60 (noting that "false phone calls were not [defendant's] regular way of operating its business" (quotation omitted)).  To the contrary, Plaintiff's Complaint acknowledges that DBFA "operates as an art gallery" (Compl. ¶ 6), and that David and Linda Benrimon

38

"are in the business of buying and selling art, either for their own accounts or the account of [DBFA]" (*id.* at ¶ 19).

Nor do the predicate acts "imply a threat of continued activity." *Reich*, 858 F.3d at 60. Predicate acts imply a continued threat only when the acts are "inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement." *United States* v. *Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995). By contrast, "frauds in the sale of property," such as those alleged here, "are not inherently unlawful." *Id.* These incidents are much better characterized as isolated and sporadic criminal acts, rather than a pattern of racketeering activity. *See United States* v. *Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989). For all of these reasons, Plaintiff's has not adequately pleaded that David and Linda Benrimon engaged in a pattern of racketeering activity.

> **b.    Plaintiff Has Failed to Plead That the Pledge Agreement Acts Constitute Wire Fraud or Transportation of Stolen Property**

To review, allegations sounding in fraud must be pleaded with particularity. *See Cohen,* 711 F.3d at 359. As a separate reason to dismiss Plaintiff's RICO claim against the Benrimon Defendants, the Court concludes that Plaintiff has failed to plead, with the requisite particularity, that the Pledge Agreement Acts depict an instance of fraud.

In stating a claim for fraud, a "plaintiff[] must allege facts that give rise to a strong inference of fraudulent intent." *Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995); *accord Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir.

2006).  "The requisite 'strong inference' of fraud may be established either [i] by alleging facts to show that defendants had both motive and opportunity to commit fraud, or [ii] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Acito*, 47 F.3d at 52 (quoting *Shields* v. *CityTrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

Plaintiff attempts to show that the Benrimon Defendants acted with fraudulent intent because Piedmont loaned Chowaiki $300,000 for which Chowaiki pledged artwork that the Benrimon Defendants knew to be stolen.  But Plaintiff has pleaded no facts supporting his oft-repeated contention that the Benrimon Defendants knew that the artwork pledged as collateral was stolen.  He asks the Court to infer as much based on several alleged facts about Chowaiki and the Gallery.  (*See* Compl. ¶ 55).  These allegations consist of the following facts: (i) Chowaiki had a court-documented history of selling and pledging stolen artwork that he had no right to sell or pledge; (ii) Chowaiki was in desperate financial straits; (iii) Chowaiki was selling or pledging artwork he did not own; (iv) Chowaiki needed the $300,000 from the loan with Piedmont to pay off another loan; (v) Chowaiki would not and could not fulfill the terms of the Shtar Isko; (vi) there was a real likelihood that Chowaiki would be arrested for his fraudulent activity; (vii) Chowaiki was selling artwork at deeply discounted prices; and (viii) the price of the three artworks was less than one-third of their true value.  (*Id*.).  Plaintiff claims that, from these facts, the Benrimon Defendants "knew or should have known" that Chowaiki was pledging them stolen artwork.  But for several reasons these allegations do not

plausibly allege that the Benrimon Defendants knew that they were buying stolen artwork, let alone give rise to a strong inference of fraudulent intent.

*First*, if claim (i) should have indicated to the Benrimon Defendants that Chowaiki was committing fraud, it should have indicated the same to Plaintiff, who nevertheless chose to consign his artwork with Chowaiki. At the pre-motion conference in this case, Plaintiff's counsel sourced his allegation that Chowaiki had a "court-documented history" of selling and pledging stolen artwork to an unrelated civil litigation, *Mosionzhnik* v. *Chowaiki*, 41 Misc. 3d 822, 972 N.Y.S.2d 841 (Sup. Ct. N.Y. Cty. 2013). (*See* July 29, 2019 Tr. 7:10-19). Of note, the decision in that case was issued on July 29, 2013, two years *before* Plaintiff consigned his artwork with Chowaiki. Plaintiff would have the Court infer that this state-court decision should have signaled to the Benrimon Defendants that Chowaiki was a crook. But it is entirely unclear to the Court why a decision in a case in which they were neither named nor involved would have put the Benrimon Defendants on notice of Chowaiki's activities. And to the extent that public access to this decision would or should have alerted the Benrimon Defendants to Chowaiki's perfidy, the same argument can be directed at Plaintiff. Relatedly, the Court rejects Plaintiff's claim (vi) that the Benrimon Defendants are liable under RICO for failing to predict that, some time off in the future, Chowaiki would be arrested and charged with wire fraud.

*Second*, Plaintiff does not elaborate on how the Benrimon Defendants would know claim (ii), that Chowaiki was in desperate financial straits. And Plaintiff's claim (iii), that Chowaiki was selling or pledging artwork he did not

41

own, is a circular allegation when proffered for the purpose of showing that the Benrimon Defendants *knew* he was selling or pledging stolen artwork.

*Third*, Plaintiff's claims (iv) and (v) fail to give rise to an inference that the Benrimon Defendants knew that the pledged artwork was stolen.  Again, Plaintiff fails to explain how the Benrimon Defendants obtained or should have obtained knowledge of Chowaiki's financial predicament.  *Fourth*, claim (viii) does not help because the loan documents evidence that Chowaiki did not sell the pledged artwork to Piedmont; he used it as collateral for the loan.  And Plaintiff has not adequately explained how or why the Benrimon Defendants would or should have known that Chowaiki was going to default on the loan.[8]

Plaintiff's strongest allegation is claim (vii), that Chowaiki was selling artwork at deeply discounted prices, giving clear warning that those works were stolen.  But this still is insufficient to prove fraudulent intent.  At the best, this allegation tends to show that the Benrimon Defendants should have been suspicious of Chowaiki.  It certainly does not provide a "strong inference of fraud."  *Acito*, 47 F.3d at 52 (internal quotation marks omitted).

The pleading technique utilized by Plaintiff here is similar to that in *Shields*, 25 F.3d at 1129 (2d Cir. 1994), where the Second Circuit rejected a

---

[8]     Plaintiff's also contends that the Benrimon Defendants knew that Chowaiki stole the Picasso because the Provenance stated that it belonged to someone who bought the Picasso at Sotheby's in London on February 6, 2007, at Lot 152.  (*See* Compl. ¶¶ 51-53; Pl. Opp. 2).  While it is true that Plaintiff, rather than Chowaiki, was the purchaser of the Picasso at the Sotheby's sale, there is nothing in the Provenance that would put someone on notice of such fact.  The Provenance makes no mention of Plaintiff by name; it merely states that ten years before Chowaiki's transaction with Piedmont, someone bought the work at Sotheby's.  Plaintiff's further accusation that the Benrimon Defendants "deleted [the Picasso's] provenance which showed that [Plaintiff] was the artwork's owner" (Pl. Opp. 17), is entirely unfounded.

plaintiff's attempt to "couple a factual statement with a conclusory allegation of fraudulent intent." This type of pleading does not suffice to meet the heightened pleading requirements of Rule 9(b), and Plaintiff therefore has not adequately pleaded the Pledge Agreement Acts as qualifying acts of wire fraud or of transportation or receipt of fraudulently obtained property.[9] The reality of the situation is that Chowaiki and the Benrimon Defendants were both participants in an elite, but opaque, fine art market. That Chowaiki and the Benrimon Defendants engaged in a transaction in which Chowaiki posted collateral that was stolen does not, in and of itself, give rise to the inference that the Benrimon Defendants were in on the fraud. On Plaintiff's reasoning, any person who purchased artwork from Chowaiki or otherwise came to obtain artwork he had stolen would be subject to RICO liability.

### c.   Plaintiff Has Failed to Plead a Nexus

A RICO violation requires a specific relationship between the enterprise and the pattern of racketeering. *D. Penguin Bros. Ltd.* v. *City Nat. Bank*, 587 F. App'x 663, 667 (2d Cir. 2014) (summary order). Under § 1962(c), the

---

[9]     Plaintiff's allegations of money laundering are entirely conclusory. (*See* Compl. ¶ 16 ("The common and unifying purpose [of each RICO enterprise] was to … launder the proceeds, if possible."); *id.* at ¶ 28 (summarily stating that "payment" for Warhol prints or painting "constitutes a violation of 18 U.S.C. § 1956 (money laundering)"); *id.* at ¶ 61 (stating that Chowaiki's deposit of the $300,000 loan payment constitutes an act of wire fraud); *id.* at ¶ 78 ("Upon information and belief and as will be disclosed in discovery, [the Benrimon Defendants] by participating in the continued sending of money or things of value to pay for *le Gueridon's* storage, and to continue fraudulently selling *le Gueridon*, without disclosing the true owner of *le Gueridon*, all in violation of wire fraud, money laundering, etc. statutes."); *id.* at ¶ 98 (describing Chowaiki's "illegal practice" of stealing artwork as money laundering violations); *id.* at ¶ 108 (describing Chowaiki's disposition of the Leger as money laundering)). His brief in opposition to the motions to dismiss does not elaborate on these conclusory assertions. (*See generally* Pl. Opp.).

enterprise's affairs must be conducted "through" the pattern of racketeering. *Id.* In other words, a plaintiff must also plausibly allege "that a nexus exist[s] between the enterprise and the racketeering activity that is being conducted." *Id.* (alteration in original) (quoting *First Capital*, 385 F.3d at 174). Plaintiff has failed to plead the required nexus for a RICO claim.

Although the Complaint parrots the RICO statute by alleging that David and Linda Benrimon "control, conduct or participate, directly or indirectly, in the conduct of [DBFA]'s affairs through a pattern of Racketeering Activity" (Compl. ¶ 20), it is devoid of any allegations supporting that characterization. To establish the required "nexus," Plaintiff must show that the Benrimons "engaged in racketeering through [DBFA] or leveraged the [DBFA] corporate structure to perpetrate the fraud." *D. Penguin Bros*, 587 F. App'x at 667; *see also United States* v. *Thai*, 29 F.3d 785, 815 (2d Cir. 1994) (finding that predicate acts must be "related to the enterprise's activities" or defendant must have been "enabled to commit the offense solely by virtue of his position in the enterprise").

There is no allegation that the Benrimons used or leveraged DBFA to commit any of the alleged RICO predicates. The Complaint itself alleges that the Latamie Acts were accomplished, at least in part, through a separate entity, Benrimon Contemporary LLC (*see* Compl. ¶¶ 24-28), which was owned by David Benrimon's son, who is not a defendant in this case. And Plaintiff does not explain how the Benrimons used or leveraged DBFA to commit the *Le Compotier* Acts, other than by proffering conclusory assertions that (i) the

Benrimons acquired the artwork "through their conduct of the affairs of [DBFA]," and (ii) they "knew or should have known," "based on their conduct of the affairs of DBFA," that Chowaiki had no authority to sell the painting.  (*Id.* at ¶¶ 29, 32).  This form of generic and group pleading — which does not state what David and Linda Benrimon each did, much less how such conduct involved DBFA — cannot establish the required nexus.  Finally, with respect to the Pledge Agreement Acts and the Court Filing Acts, the Complaint itself alleges that the relevant transactions and court filings were conducted through Piedmont, not DBFA.  (*See id.* at ¶¶ 34-80).  Accordingly, when the Court analyzes the Complaint to discern a nexus between the alleged pattern of racketeering activity and the alleged enterprise, Plaintiff's RICO claim falls apart.

> **d.  Plaintiff Has Failed to Plead That Defendants Conspired to Participate in David and Linda Benrimon's Pattern of Racketeering Activity**

Building on the foregoing analysis, the Court concludes that Count II of the Complaint must also be dismissed.  In that count, Plaintiff alleges that the Benrimon Defendants and Chowaiki conspired to facilitate David and Linda Benrimon's racketeering activity in Count I.  But beyond the allegations underlying the substantive RICO claim, Plaintiff has not pleaded any facts from which the Court could infer a conspiracy to commit a RICO violation.  *See Hecht*, 897 F.2d at 25 (affirming dismissal of RICO conspiracy claim where complaint "d[id] not allege facts implying any agreement involving each of the defendants to commit at least two predicate acts").  And, as explained above,

the allegations making out the substantive RICO claim are deficient.  *See*

*Johnson* v. *Nextel Commc'ns, Inc.*, 763 F. App'x 53, 56 (2d Cir. 2019) (summary

order) (dismissing plaintiffs' RICO conspiracy claim for the same reasons that

their substantive RICO claim was deficient).  Accordingly, the Court dismisses

Counts I and II of the Complaint.

### 2.    The Court Dismisses Plaintiff's RICO Claims Predicated on Unlawful Debt Collection (Counts III, IV, V, and VI)

Plaintiff's Complaint also contains several RICO claims based on

unlawful debt collection.  In particular, Count III of the Complaint alleges that

Avichai Rosen conducted or participated in the conduct of the Piedmont

enterprise's affairs through the collection of unlawful debt.  (Compl. ¶¶ 119-

21).  Count IV alleges that David and Linda Benrimon, DBFA, and Chowaiki

conspired with Rosen to conduct or participate in the affairs of Piedmont

through the collection of unlawful debt.  (*Id.* at ¶¶ 122-25).  Count V alleges

that David and Linda Benrimon conducted or participated in the conduct of the

DBFA enterprise's affairs through the collection of unlawful debt.  (*Id.* at

¶¶ 126-28).  And Count VI alleges that David and Linda Benrimon, Chowaiki,

Rosen, and Piedmont conspired with each other in the collection of unlawful

debt through the affairs of DBFA.  (*Id.* at ¶¶ 129-32).

Section 1962(c) makes it unlawful for "any person employed by or

associated with any enterprise … to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through … unlawful

collection of debt."  18 U.S.C. § 1962(c).  The statute defines "unlawful debt" to

mean (as relevant here) debt "which was incurred in connection with … the

business of lending money ... at a rate usurious under State or Federal law." *Id.* § 1961(6).

"The inclusion of 'collection of unlawful debt' as a major predicate for RICO liability seems to have been an explicit recognition of the evils of loan sharking, and there is no indication that Congress was taking aim at legitimate banking institutions." *Durante, Bros. & Sons, Inc.* v. *Flushing Nat'l Bank,* 755 F.2d 239, 250 (2d Cir. 1985). In consequence, the Second Circuit has interpreted the statute to make clear that a RICO claim for collection of unlawful debt does not encompass "occasional usurious transactions by one not in the business of loan sharking." *Id.* (noting that "[t]he target of [RICO] is ... not sporadic activity"). Instead, to state a claim under RICO for unlawful debt collection, the plaintiff must allege that "each defendant was lending money or a thing of value at a rate usurious under State or Federal law" and that "each defendant was in the business of doing so." *United States* v. *Persico,* No. 10 Cr. 147 (SLT), 2011 WL 2433728, at *2 (E.D.N.Y. June 14, 2011) (internal quotation marks omitted).

Plaintiff comes nowhere close to meeting his burden to state a claim for unlawful debt collection practices by any of the Defendants. The Complaint describes but one instance (the $300,000 loan from Piedmont to the Gallery) in which Piedmont made a usurious loan.[10] The remainder of Plaintiff's

---

[10]    The Court is not swayed by Plaintiff's attempt to disaggregate this single loan transaction into its component pieces in order to substantiate his claim that Piedmont and Rosen were in the business of making usurious loans. (*See* Compl. ¶¶ 85-86; Pl. Opp. 30).

allegations on this point are wholly (and impermissibly) conclusory.  (*See, e.g.,*
Compl. ¶ 85 ("Piedmont and Avichai Rosen's business is to lend money or a
thing of value at a usurious rate.  This business involves extensive activity over
a substantial period of time and constitutes a substantial portion of the
activities of both Piedmont and Avichai Rosen.")).  Plaintiff does not point to a
single other instance in which any of the Defendants made a usurious loan,
and there is nothing in the Complaint to support his conclusory assertion that
any of the Defendants is in the business of making usurious loans.

Accordingly, as in *Durante*, the Complaint here "gives no promise that
[Plaintiff] will be able to establish that [any of the Defendants was] engaged in
'the business of' making usurious transactions."  755 F.2d at 250; *see also*
*Weisel* v. *Pischel*, 197 F.R.D. 231, 241 (E.D.N.Y. 2000) (finding plaintiff had not
established that defendant was in the business of making usurious
transactions where "at no point in the complaint, or in any other document
submitted to the court, do the plaintiffs describe other individuals or
companies to whom [defendants] lent money or the usurious interest rates
attached to any other loan by the defendants"); *Robidoux* v. *Conti*, 741 F. Supp.
1019, 1021-22 (D.R.I. 1990) (dismissing RICO claim for collection of unlawful
debt where allegations involved just "two isolated incidents" in which defendant
charged usurious rates).[11]  And, because the Complaint does not provide any

---

[11]     Plaintiff argues that he need not allege multiple usurious loans made over a long period
of time to state a RICO claim for usurious lending.  (Pl. Opp. 26.)  He explains that
"there is no requirement in the statute or case law that plaintiff must allege or prove
multiple usurious loans, longevity, or a pattern of usurious loans to prevail on a claim
that defendants 'were in the business of lending money or a thing of value at a rate

further allegations evidencing that Defendants "consciously agreed" to collect unlawful debts under § 1962(c), *see Black Radio Network, Inc* v. *NYNEX Corp.*, 44 F. Supp. 2d 565, 581 (S.D.N.Y. 1999), the Complaint does not "set forth a conspiracy to commit such violations" under § 1962(d), *Discon, Inc.* v. *NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998).  Accordingly, Counts III, IV, V, and VI of the Complaint are dismissed.

### 3. The Court Dismisses Plaintiff's RICO Claims Against Chowaiki (Count VII) and His RICO Conspiracy Claim Against All Defendants (Count VIII)

Count VII of the Complaint alleges a RICO claim against Chowaiki for engaging in a pattern of racketeering activity through the Gallery (Compl. ¶¶ 133-35), while Count VIII alleges that the remaining Defendants conspired with Chowaiki to facilitate his racketeering (*id.* at ¶¶ 136-40).  According to Plaintiff, the pattern of racketeering activity consisted of numerous acts of wire fraud, transportation of stolen or fraudulently acquired property, money laundering, and various other acts.  (*See* Pl. Opp. 13).  A look at the substance of Plaintiff's allegations, however, makes clear that he has failed to state a RICO claim against Chowaiki.

With respect to Chowaiki, Plaintiff has pleaded only the following facts: (i) Chowaiki repeatedly promised to return the Picasso and the Leger to Plaintiff

---

usurious under State or Federal law.'" (*Id.*).  Plaintiff is correct that there is nothing in the text of the RICO statute that requires multiple usurious loans be alleged.  But, as explained above, the case law requires a plaintiff to show that the defendants were in the business of making usurious transactions, and Plaintiff's allegations on this point do not suffice.

but never did; (ii) Plaintiff sold the Leger to another entity, while it belonged to Plaintiff; (iii) Chowaiki used the Picasso, and two other artworks that he did not own, as collateral for a loan.  The remainder of Plaintiff's allegations against Chowaiki are conclusory.  (*See* Compl. ¶ 96 ("Upon information and belief, from its inception, through at least July 20, 2009, Mr. Chowaiki, repeatedly conducted or participated, directly or indirectly, in the conduct of his Gallery's affairs by repeated acts of wire fraud in which he obtained his customers' art works by fraudulently telling them that he would sell them on consignment, whereas, he illegally used those artworks as collateral for loans, each such instance involving one act of wire fraud[.]"); *id.* at ¶ 100 (quoting wire fraud charging language against Chowaiki); *id.* at ¶¶ 29-30 (alleging that Chowaiki committed fraud by selling *Le Compotier* to the Benrimons despite not owning it, but failing to allege the time, place, speaker, and content of any misrepresentation)).  Plaintiff seems to assume that because Chowaiki pleaded guilty to wire fraud, and because the Gallery filed for bankruptcy, it is obvious that Chowaiki can be held liable for RICO violations.  While the docket in the Criminal Case undoubtedly contains factual material that could bolster Plaintiff's claims, he does not include any such information in his Complaint, nor does he adequately incorporate such material by reference.  (*See, e.g.,* Compl. ¶¶ 98-99 (referring only to paragraphs 1 through 4 of the criminal complaint); *id.* at ¶ 101 (citing forfeiture order in the Criminal Case as evidence

that Chowaiki stole the Picasso)).[12]  Plaintiff's Complaint does not explain

which artwork (other than his own and *Le Compotier*) was stolen, from whom

Chowaiki stole any artwork, what misrepresentations he made to obtain such

artwork, where it was transported, or how he disposed of such artwork.  To the

extent Plaintiff relies on predicate acts of wire or mail fraud or transportation of

fraudulently obtained property, he must plead them with particularity, which

he has failed to do.[13]

Further, the acts that Plaintiff does allege with some level of specificity

could have spanned, at most, from August 2016 (which is when the Picasso

and Leger consignments ended and Chowaiki began promising he would return

the paintings (*see* Compl. ¶ 105)), to December 2017, when Chowaiki was

arrested (*see* Criminal Case, Dkt. #4).  Because the acts occurred over the span

of a little more than one year, they cannot demonstrate closed-ended

continuity.  *See Spool*, 520 F.3d at 184 ("Although we have not viewed two

years as a bright-line requirement, it will be rare that conduct persisting for a

shorter period of time establishes closed-ended continuity[.]").  And Plaintiff

has not alleged open-ended continuity because, among other things, Chowaiki

was criminally charged and sentenced to 18 months' imprisonment in Federal

---

[12]   The Court recognizes that a complaint may incorporate material or a document outside of the complaint by reference, and that a court can consider such incorporated material on a Rule 12(b)(6) motion.  *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).  The problem here is that Plaintiff does not refer to portions of the Criminal Case docket that would support his RICO claim.  *Cf. Sira* v. *Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (finding incorporation where complaint "explicitly refer[ed] to and relie[d] upon two of the documents at issue").

[13]   As explained *infra* note 9, Plaintiff has failed to allege, with any specificity, how the alleged predicate acts satisfy the elements of money laundering.

Bureau of Prisons custody.  (*See* Compl. ¶ 5; Criminal Case, Dkt. #76).  For this reason, Plaintiff has not adequately pleaded a RICO claim against Chowaiki.[14]

Plaintiff has also failed to plead a claim against the Benrimon Defendants for conspiracy to facilitate Chowaiki's pattern of racketeering activity.  As explained above, Plaintiff has not adequately pleaded that the Benrimon Defendants knew that the collateral Chowaiki pledged to Piedmont was obtained fraudulently.  (*See supra* 39-42).  The most Plaintiff alleges is that the Benrimon Defendants bought *Le Compotier* from Chowaiki despite knowing that Chowaiki had no authority to transfer the artwork to them.  (*See* Compl. ¶¶ 32-33).  This was just one act.  The remainder of Plaintiff's allegations merely incant that the Benrimon Defendants "knew or should have known" about Chowaiki's alleged scheme, or that they "could and should have" done more to vet the provenance of Chowaiki's artworks.  (*See, e.g.*, Compl. ¶ 43 ("each of the defendants knew or should have known that the works of art to be sold were in the Gallery's continued possession as a result of fraud"); *id.* at ¶ 53 (defendants "could and should have demanded proof of how Mr. Chowaiki and/or his Gallery came into possession of that work of art"); *id.* at ¶ 55 ("each of the defendants knew, or should have known, that … Mr. Chowaiki was selling or pledging works of art he did not own and had no right to sell or

---

[14]   To the extent that Plaintiff means to allege that his consignment with Chowaiki was fraudulent *ab initio*, it fails for two reasons.  *First*, such a fraud is not pleaded with the specificity required by Rule 9(b).  *Second*, the claim fails for want of domestic injury, as discussed *infra*.

pledge")).  The Court does not credit these conclusory statements about a defendant's knowledge.  *See Anonymous* v. *Simon*, No. 13 Civ. 2927 (RWS), 2014 WL 819122, at *4 (S.D.N.Y. Mar. 3, 2014)).  In any event, allegations about what the Benrimon Defendants "should have known" do not "show specifically that [they] had any 'meeting of the minds' [with Chowaiki] in the alleged violations," an essential feature of the required agreement.  *4 K & D Corp.* v. *Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 545 (S.D.N.Y. 2014); *Browning Ave. Realty Corp.* v. *Rosenshein*, 774 F. Supp. 129, 145 (S.D.N.Y. 1991) (no "meeting of the minds" or agreement can be inferred from allegations about what a defendant "knew or should have known").

As yet another pleading deficiency, the Complaint lacks sufficient allegations that the Benrimon Defendants actually agreed with Chowaiki and with each other to violate RICO's substantive provisions.  Plaintiff asserts in vague and conclusory terms that Defendants "conspired" and "agreed" with each other.  (*See, e.g.*, Compl. ¶¶ 14, 57, 61, 108, 111, 137).  But all that the Complaint shows is that the Benrimon Defendants and Chowaiki did business together on two separate occasions.  Such allegations are plainly insufficient to show a RICO conspiracy.  *See Foster* v. *2001 Real Estate*, No. 14 Civ. 9434 (RWS), 2015 WL 7587360, at *6 (S.D.N.Y. Nov. 24, 2015); *Ray Larsen Assocs., Inc.* v. *Nikko America, Inc.*, No. 89 Civ. 2809 (BSJ), 1996 WL 442799, at *9 (S.D.N.Y. Aug. 6, 1996) (finding that conclusory allegations that defendants "agreed and conspired" do not provide a "factual basis for a finding of

conscious agreement among [defendants] to commit predicate acts").
Accordingly, Counts VII and VIII of the Complaint are dismissed.

### 4.     The Court Dismisses Plaintiff's RICO Claims Based on a Failure to Allege Domestic Injury

In addition to the defects outlined above, the Complaint also fails to plead domestic injury.  In *Bascuñán*, the Second Circuit instructed that an "injury to tangible property is generally a domestic injury only if the property was physically located in the United States."  874 F.3d at 819.  The Court again explained that "[w]here the injury is to tangible property ... absent some extraordinary circumstance, the injury is domestic if the plaintiff's property was located in the United States when it was stolen or harmed, even if the plaintiff himself resides abroad."  *Id.* at 820-21; *see Elsevier Inc.* v. *Grossmann*, No. 12 Civ. 5121 (KPF), 2017 WL 5135992, at *4 (S.D.N.Y. Nov. 2, 2017).  "The [*Bascuñán*] court stressed that the focus of the domestic injury analysis is on the location of the plaintiff's property when it is harmed, and not on the location of the defendant when the wrongful conduct was committed."  *Martin Hilti Family Tr.* v. *Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 345 (S.D.N.Y. 2019).  Following from *Bascuñán*, Plaintiff has alleged domestic injury if his property was located in the United States when it was stolen or harmed, despite the fact that Plaintiff is a foreign resident.  *See id.* at 346-47.  Conversely, to the extent Plaintiff's property was located abroad when it was stolen or harmed, he has not alleged a domestic injury.  *See id.* at 347.

The facts of this case resemble those in *Martin Hilti*.  In that case, the plaintiff learned about and received false information about a painting when he

54

visited the defendant-gallery in New York.  386 F. Supp. 3d at 346.  The painting was not available to be shown to the plaintiff, however, so the gallery delivered the painting to Liechtenstein, so that the plaintiff could view the painting before deciding whether to purchase it.  *Id.*  The plaintiff then decided to purchase the painting and transferred money from its bank account in Liechtenstein to the defendant's bank account in New York.  *Id.*  In *Martin Hilti,* the defendant argued that plaintiff was injured in Liechtenstein, when the funds constituting the purchase price for the painting were transferred from the plaintiff's Liechtenstein bank account to defendant's bank account in New York.  *Id.*  The district court agreed with the defendant, explaining that the plaintiff's "injury occurred where it relinquished control over its property … [and] [b]ecause [the plaintiff] relinquished control over its money in Liechtenstein — when it authorized a transfer of funds from its Liechtenstein bank account to [defendant's] New York account — the [plaintiff's] injury was suffered in Liechtenstein."  *Id.* at 347-48.

Plaintiff here argues that his artwork was located in New York when it was stolen.  He explains that he sent the Picasso and the Leger to Chowaiki on consignment in June 2015, and that it was only after termination of the consignment, once the artwork was already in New York, that the artwork was, in essence, stolen from him.  (Pl. Opp. 33 (citing Compl. ¶¶ 35-37)).  In opposition, Defendants point to the Complaint's repeated allegations that Chowaiki's scheme was to lure clients to consign their art with him and then sell or otherwise use the artwork in a way in which he was not authorized to

do.  (*See, e.g.,* Compl. ¶ 96 ("Upon information and belief, from its inception, through at least July 20, 2009, Chowaiki repeatedly conducted or participated, directly or indirectly, in the conduct of his Gallery's affairs by repeated acts of wire fraud in which he obtained his customers' art works by fraudulently telling them that he would sell them on consignment, whereas, he illegally used those artworks as collateral for loans[.]"); *id.* at ¶ 99 (describing Chowaiki's illegal practice as "defraud[ing] purchasers and sellers of fine art by deceiving them into sending funds or artwork to his gallery in New York, New York, under false pretenses")).  They also point to Plaintiff's counsel's statements at the pre-motion conference, at which time counsel represented that Plaintiff was injured as part of Chowaiki's scheme of stealing "artwork from abroad on consignment and other ways."  (July 29, 2019 Tr. 5:11-15).  From these allegations, Defendants reason that the fraud resulting in the alleged theft of the Picasso and the Leger was actually committed at the time Chowaiki represented that he would sell Plaintiff's works on consignment and remit the funds to Plaintiff, with no intention of doing so.  Thus, the argument proceeds, Plaintiff's injury occurred in Spain, when Plaintiff was falsely induced into parting with his artwork, and not in the United States, where Chowaiki was located.

The Court agrees with the Defendants that Plaintiff has failed to allege a domestic injury.  While Plaintiff claims that he began demanding his artwork

back after the expiration of the consignment period (*see* Compl. ¶ 37),[15] he also repeatedly alleges that Chowaiki "obtained his customers' art works by fraudulently telling them that he would sell them on consignment" (*id.* at ¶ 96), and that the purpose of the scheme was to "defraud[] … sellers of fine art by deceiving them into sending … artwork to [Chowaiki's] gallery in New York, New York under … false pretenses" (*id.* at ¶ 99).  The Court cannot turn a blind eye to these allegations when considering when and where Plaintiff's injury occurred.  Accepting Plaintiff's own allegations, his injury occurred in Spain, when he relinquished control over the Picasso and the Leger to Chowaiki.  Accordingly, Plaintiff's failure to allege a domestic injury provides yet another ground for dismissing his RICO claims.

## C.    The Court Dismisses Certain of Plaintiff's State-Law Claims

Having dismissed Plaintiff's RICO claims, the Court now turns to Plaintiff's state-law claims for fraud, conspiracy to defraud, conversion, conspiracy to convert, and replevin.  For the reasons explained below, Plaintiff's claims against Chowaiki for fraud, conversion, and replevin survive with respect to both the Picasso and the Leger, and Plaintiff's claims against the

---

[15]    In Plaintiff's brief, he states that "[a]fter termination of the three-month consignment, Mr. Chowaiki, on multiple occasions, fraudulently induced Mr. Malvar to let the works of art remain in New York, [Compl.] ¶¶ 37, 105-106." (Pl. Br. 6).  But the paragraphs of Plaintiff's Complaint that he cites do not state that Chowaiki induced Plaintiff to let the artwork remain in New York, nor do they state that the consignment lasted three months.  The Complaint merely states that: (i) the artwork was given to Chowaiki on consignment; (ii) at some point, Plaintiff and his brother requested its return; (iii) Chowaiki repeatedly promised to return the artwork; (iv) Chowaiki never actually returned the artwork; and (v) Chowaiki sold the Leger to a company in the United Kingdom.  (*See* Compl. ¶¶ 37, 105-06).

Benrimon Defendants for conversion and replevin survive with respect to the Picasso.  Plaintiff's remaining state-law claims are dismissed.

### 1. The Court Has Subject Matter Jurisdiction to Consider Plaintiff's State-Law Claims

Chowaiki argues that if the Court dismisses the RICO claims, which are indisputably the only federal claims in this action, it should decline to exercise supplemental (or pendent) jurisdiction over Plaintiff's state-law claims. (Chowaiki Br. 19-20).  He argues that, to the extent Plaintiff's claims are viable against Chowaiki, they should be heard in state court in New York, rather than in federal court, in the absence of a viable federal cause of action.  (*Id.*).

What Chowaiki fails to recognize is that the Court has original jurisdiction over this case in the forms of both subject matter *and* diversity jurisdiction.  (*See* Compl. ¶ 1).  The Court has diversity jurisdiction over this case because Plaintiff is a citizen of a foreign state (Spain) and is not a permanent resident of the United States; Defendants are all citizens of the United States; and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332(a)(2).  Accordingly, the Court can exercise diversity jurisdiction over the remaining state-law claims, without resorting to supplemental jurisdiction.  For this reason, the Court will maintain jurisdiction over this matter, despite the dismissal of the RICO claims.

As it happens, Chowaiki moves to dismiss the state-law claims only on jurisdictional grounds.  In other words, he does not attack the adequacy of the

pleading of those claims.[16]  For this reason, Chowaiki's motion is denied

insofar as it seeks dismissal of the state-law claims against him.  The Court

addresses the adequacy of the pleadings of the state-law claims only with

respect to the Benrimon Defendants, who have actually challenged the viability

of those claims as pleaded.

> ### 2.  Plaintiff Has Not Adequately Pleaded Claims for Common-Law Fraud and Conspiracy to Defraud Against the Benrimon Defendants

To state a claim for fraud under New York law, a plaintiff must allege

that (i) the defendant made a misrepresentation or material omission of fact,

(ii) that was false and known to be false by the defendant, (iii) made for the

purpose of inducing the plaintiff to rely upon it, (iv) the plaintiff's justifiable

reliance on the misrepresentation or material omission, and (v) injury.

*Pasternack* v. *Laboratory Corp. of America Holdings*, 27 N.Y.3d 817, 827 (2016);

*see In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 212-13 (S.D.N.Y. 2019).  As

noted above, claims for fraud, even under state law, must also satisfy the

heightened pleading requirements of Rule 9(b).  *See Premium Mortg. Corp.* v.

*Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009).  To review, Rule 9(b) requires a

plaintiff to specify the fraudulent statements, identify the speaker, state when

and where the statements were made, and explain why the statements were

fraudulent.  *Eternity Glob. Master Fund Ltd.* v. *Morgan Guar. Tr. Co. of N.Y.*, 375

F.3d 168, 186-87 (2d Cir. 2004).  To plead a viable claim for conspiracy to

---

[16]    Indeed, Chowaiki explicitly states that "when the Complaint is distilled to its essential facts, it is plainly evident that it … is, in actuality the proverbial sheep of [ ] state-law conversion and replevin claims[.]"  (Chowaiki Br. 1).

commit fraud under New York law, in addition to pleading the underlying fraud, the plaintiff must allege the following with the required specificity as to each defendant: "[i] an agreement among two or more parties, [ii] a common objective, [iii] acts in furtherance of the objective, and [iv] knowledge." *JP Morgan Chase Bank* v. *Winnick*, 406 F. Supp. 2d 247, 259 (S.D.N.Y. 2005).

As the Benrimon Defendants note (*see* Benrimon Br. 21 n.8), Plaintiff's fraud claim appears to allege only that the Benrimon Defendants conspired in Chowaiki's commission of fraud — that is, Plaintiff does not appear to allege a direct claim of fraud against the Benrimon Defendants. (*See* Compl. ¶¶ 141-44). However, the Complaint repeatedly states that the Benrimon Defendants "defrauded" Plaintiff. (*See, e.g.*, *id.* at ¶¶ 21, 59, 63). For this reason, and for the avoidance of doubt, the Court considers both species of fraud claims.

Ultimately, the Court concludes that Plaintiff has not satisfied the pleading requirements with respect to either type of claim against the Benrimon Defendants. The Court dismisses the conspiracy to defraud claim because Plaintiff has failed to allege "a corrupt agreement" and "membership in the conspiracy by each defendant." *Cofacredit,* 187 F.3d at 240. Plaintiff repeatedly protests that the Benrimon Defendants "knew or should have known" about Chowaiki's scheme. (*See, e.g.*, Compl. ¶¶ 40, 43, 46, 54, 57, 60, 61, 86). However, his claim is supported only by conclusory allegations, which are insufficient to establish that the Benrimon Defendants had a "meeting of the minds" with Chowaiki. *See Browning Ave. Realty Corp.*, 774 F. Supp. at 145 (concluding that allegation that defendant "knew or should have known" of

60

another defendant's fraud was insufficient to show that defendant entered into a conspiracy with the other defendant); *see also Gmurzynska* v. *Hutton*, 257 F. Supp. 2d 621, 630 (S.D.N.Y. 2004) ("[M]ere allegations that defendants knew one another, or had prior relationships unrelated to the wrongful acts alleged in the Complaint, are insufficient, standing alone, to set forth a conspiracy claim."). For this reason, Plaintiff's claim that the Benrimon Defendants conspired with Chowaiki to defraud him of the Picasso is dismissed.

To the extent Plaintiff attempts to assert a fraud claim directly against the Benrimon Defendants, that claim is also dismissed. Plaintiff has not alleged a single misstatement or omission that any of the Benrimon Defendants made to Plaintiff. Indeed, aside from alleging that Plaintiff demanded the return of the Leger from the Benrimon Defendants, Plaintiff has not alleged that the Benrimon Defendants had any communication with Plaintiff. Plaintiff vaguely asserts that the Benrimon Defendants intended for Plaintiff to rely on the documents evidencing the $300,000 loan. (*See* Compl. ¶ 59). However, Plaintiff does not allege that the Benrimon Defendants ever provided these documents to him, nor does he allege that (or even how) he reasonably could have relied on them. Accordingly, Plaintiff's fraud claim against the Benrimon Defendants is dismissed.

### 3.    Plaintiff Has Adequately Pleaded a Conversion Claim Against the Benrimon Defendants as to the Picasso

By contrast, Plaintiff's non-fraud-based state-law claims survive. Under New York law, to plead a claim of conversion, a plaintiff must establish that "[i] the property subject to conversion is a specific identifiable thing; [ii] plaintiff

had ownership, possession[,] or control over the property before its conversion; and [iii] defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Murray Eng'g P.C.* v. *Remke*, No. 17 Civ. 6267 (KPF), 2018 WL 3773991, at *13 (S.D.N.Y. Aug. 9, 2018).  "The tort of conversion does not require defendant's knowledge that he is acting wrongfully, but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another." *LoPresti* v. *Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (quotation omitted).  Further, New York distinguishes claims that the defendant wrongfully detained — in contrast to having wrongfully taken — the property in question.  *Newbro* v. *Freed*, 409 F. Supp. 2d 386, 394 (S.D.N.Y. 2006).  For claims of wrongful detention, where the possession is originally lawful, a conversion does not occur until the owner makes a demand for return of the property and the person in possession of the property refuses to return it.  *See Regions Bank* v. *Wieder & Mastroianni, P.C.*, 526 F. Supp. 2d 411, 414 (S.D.N.Y. 2007).

Plaintiff alleges that the Benrimon Defendants converted the Picasso, and that they conspired with Chowaiki to convert the Leger.  (*See* Compl. ¶¶ 145-49).  Plaintiff has stated a claim for conversion against the Benrimon Defendants for the Picasso.  The Benrimon Defendants do not dispute that they had possession of the Picasso.  They contend, however, that their original possession of the Picasso was lawful because they obtained possession of the Picasso through the Release and Settlement Agreement with Chowaiki, in

which Chowaiki stated that he was "the record and beneficial owner" of the Picasso. (*See* Benrimon Br. 21 (quoting Compl. ¶ 49)). The Court agrees. As such, Plaintiff was required to make a demand on the Benrimon Defendants for the return of the Picasso. *See Marks* v. *Energy Materials Corp.*, No. 14 Civ. 8965 (GHW), 2015 WL 3616973, at *4-5 (S.D.N.Y. June 9, 2015).

The Benrimon Defendants argue that Plaintiff has insufficiently pleaded that the "demand and refusal" requirement was satisfied because "Plaintiff does not specify when he made his demand of each Benrimon Defendant, when each Benrimon Defendant refused, and the words or actions that each party used to convey the demand or refusal." (Benrimon Br. 23).[17]  But in so doing, they misperceive the law.  The reason for the demand and refusal requirement is simply so that a *bona fide* purchaser of property does not become a wrongdoer until he is informed of the defect of his title and has an opportunity to deliver the property to its true owner.  *See Employers' Fire Ins. Co.* v. *Cotton*, 245 N.Y. 102, 105 (1927).  But the demand and refusal requirement of a conversion claim, unlike Plaintiff's many fraud-based claims, need not be pleaded with particularity.  Plaintiff has alleged that he "has requested each defendant [] return [the Picasso to him], and defendants have refused to do so." (Compl. ¶ 65).  That is all Plaintiff must allege at this stage.  The Benrimon Defendants' claim that they did not refuse to return the Picasso because they did not have it in the first place (*see* Benrimon Br. 23-24), is contrary to the well-pleaded

---

[17]    It is unclear to the Court from where the Benrimon Defendants discern the requirement that a plaintiff must plead these specific facts to allege demand and refusal.

allegations in the Complaint, which allegations plainly state that the Benrimon Defendants are in possession of the Picasso even today (*see* Compl. ¶¶ 71-72).

That said, to the extent Plaintiff has attempted to plead that the Benrimon Defendants conspired with Chowaiki to convert the Leger, the claim must be dismissed. As explained above, Plaintiff has alleged no facts to establish that the Benrimon Defendants had a "meeting of the minds" with Chowaiki. What is more, there are no non-conclusory allegations in the Complaint to show that the Benrimon Defendants even knew of Chowaiki's conversion of the Leger. Accordingly, the Court sustains Plaintiff's claim against the Benrimon Defendants for conversion of the Picasso, and dismisses his claim against them for conspiracy to convert the Leger.

### 4. Plaintiff Has Adequately Pleaded a Replevin Claim Against the Benrimon Defendants as to the Picasso

Replevin is a remedy employed to recover specific, identifiable items of personal property. *TAP Manutenção e Engenharia Brasil S.A.* v. *Int'l Aerospace Grp., Corp.*, 127 F. Supp. 3d 202, 211 (S.D.N.Y. 2015). "To establish a claim for replevin, the plaintiff must prove two elements: [i] that plaintiff has a possessory right superior to that of the defendant; and [ii] that plaintiff is entitled to the immediate possession of that property." *Int'l Bus. Machines Corp.* v. *BGC Partners, Inc.*, No. 10 Civ. 128 (PAC), 2013 WL 1775367, at *9 (S.D.N.Y. Apr. 25, 2013). Notably, New York allows a claim of replevin to lie even if the defendant is no longer in possession of the property in question. *Chen* v. *New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 456 (S.D.N.Y. 2014).

As with a conversion claim, "an innocent purchaser of stolen goods becomes a wrongdoer only after refusing the owner's demand for their return." *Kunstsammlungen Zu Weimar* v. *Elicofon*, 678 F.2d 1150, 1161 (2d Cir. 1982); *see also Williams* v. *Nat'l Gallery of Art, London*, No. 16 Civ. 6978 (VEC), 2017 WL 4221084, at *7 n.13 (S.D.N.Y. Sept. 21, 2017) ("[D]emand and refusal are requisite elements of the cause of action for replevin and conversion if defendant is a good faith purchaser." (quotation omitted)); *Dore* v. *Wormley*, 690 F. Supp. 2d 176, 183 (S.D.N.Y. 2010) ("Demand upon, and refusal of, the person in possession of the chattel to return it are essential elements of a cause of action in replevin." (citation and alteration omitted)).

Plaintiff has adequately pleaded a replevin claim against the Benrimon Defendants with respect to the Picasso.  Plaintiff has claimed that he is the lawful owner of the Picasso; that he has a possessory right superior to that of the Benrimon Defendants because Chowaiki had no right to transfer title of the Picasso to them; and that he has made a demand on the Benrimon Defendants for its return, which demand was refused.  The Benrimon Defendants' protestation that they no longer possess the Picasso must be ignored, as the Complaint alleges that the Benrimon Defendants possess the Picasso and continue to pay for its storage abroad.  (*See* Compl. ¶¶ 71-72).  Accordingly, Plaintiff has adequately pleaded a replevin claim against the Benrimon Defendants for the Picasso.

### D.    The Court Denies Plaintiff's Request for Leave to Replead

Plaintiff requests leave to replead his Complaint in the event the Court dismisses any of his claims.  (Pl. Opp. 35).  Plaintiff's request is denied with respect to his RICO claims.  These claims have been dismissed on multiple grounds, and Plaintiff has failed to explain how a further amendment would cure the various deficiencies with these claims.  *See Westgate Fin. Corp.* v. *Beinoni of N.Y. Inc.*, No. 10 Civ. 8102 (TPG), 2012 WL 219334, at *4 (S.D.N.Y. Jan. 25, 2012) (denying leave to replead RICO complaint on futility grounds where plaintiff did not explain how a further amendment would cure deficiencies); *see generally Nielsen* v. *Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (acknowledging that leave to amend a complaint may be denied when amendment would be futile).

Plaintiff's request is also denied insofar as the Court has dismissed his state-law claims.  Plaintiff's amendment regarding claims against the Benrimon Defendants relating to the Leger would be futile, as (i) the Complaint contains no allegations tying the Benrimon Defendants to that artwork and (ii) Plaintiff concedes that the Benrimon Defendants are only responsible for the Leger through conspiratorial liability, a theory the Court has already rejected.

### E.    The Court Grants in Part and Denies in Part the Benrimon Defendants' Motion for Rule 11 Sanctions

The Court now turns to the Benrimon Defendants' motion for sanctions pursuant to Rule 11.  Specifically, the Benrimon Defendants have moved for "all available sanctions under Rule 11 against Plaintiff and his counsel ...

66

including by awarding the Benrimon Defendants their attorneys' fees and costs they have incurred in defending this action." (Benrimon Sanctions Br. 3).

### 1.   Applicable Law

Federal Rule of Civil Procedure 11(b) provides, in relevant part, that [b]y presenting to the court a pleading, written motion, or other paper ... an attorney ... certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). The rule imposes on attorneys "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing." *Bus. Guides, Inc.* v. *Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991).

The Second Circuit has offered the following guidance concerning the imposition of sanctions under Rule 11:

> A pleading, motion or other paper violates Rule 11 either when it has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the

> pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Kropelnicki* v. *Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (internal quotation marks omitted).  For example, Rule 11 is violated "where it is patently clear that a claim has absolutely no chance of success under the existing precedents." *Eastway Constr. Corp.* v. *City of New York*, 762 F.2d 243, 254 (2d Cir. 1985), *superseded on other grounds by rule.*

*Sorenson* v. *Wolfson*, 683 F. App'x 33, 35 (2d Cir. 2017) (summary order); *see also Star Mark Mgmt., Inc.* v. *Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012) (noting that Rule 11 sanctions for pleadings are subject to an "objective unreasonableness" standard); *cf. Fishoff* v. *Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) ("The fact that a legal theory is a long-shot does not necessarily mean it is sanctionable.  The operative question is whether the argument is frivolous, *i.e.*, the legal position has 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'" (internal citations omitted)).

"As numerous courts in this Circuit have recognized, Rule 11 is particularly significant in the civil RICO context because commencement of a civil RICO action has an almost inevitably stigmatizing effect on those named as defendants." *Edmonds* v. *Seavey*, No. 08 Civ. 5646 (HB), 2009 WL 4404815, at *3 (S.D.N.Y. Dec. 2, 2009) (internal quotation marks omitted) (citing *Hoatson* v. *New York Archdiocese*, No. 05 Civ. 10467 (PAC), 2007 WL 431098 (S.D.N.Y. Feb. 8, 2007) (quoting *Katzman* v. *Victoria's Secret Catalogue*, 167 F.R.D. 649, 660 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997))).  That is, civil RICO

is considered an "unusually potent weapon," often referred to as the "litigation equivalent of a thermonuclear device." *See, e.g., Cedar Swamp Holdings, Inc.* v. *Zaman*, 487 F. Supp. 2d 444, 449 (S.D.N.Y. 2007); *Dubai Islamic Bank* v. *Citibank, N.A.*, 256 F. Supp. 2d 158, 163 (S.D.N.Y. 2003); *Katzman*, 167 F.R.D. at 655 (quoting *Miranda* v. *Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)).  Courts have not hesitated to impose sanctions under Rule 11 when RICO claims have been found to be frivolous.  *Edmonds,* 2009 WL 440815, at *3 (citing *Dangerfield* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 02 Civ. 2561 (KMW) (GWG), 2003 WL 22227956, at *13-14 (S.D.N.Y. Sept. 26, 2003) (admonishing plaintiff's counsel for frivolous RICO claim)); *see also, e.g.*, *O'Malley* v. *N.Y.C. Transit Auth.*, 896 F.2d 704, 709 (2d Cir. 1990) (remanding for imposition of sanctions where plaintiff "failed to allege even one act that could qualify as racketeering activity under RICO"); *Katzman*, 167 F.R.D. at 660 (finding a Rule 11 violation where "even a cursory examination of the requirements for bringing suit under RICO would have revealed the impossibility of the claim's success"); *McLoughlin* v. *Altman*, 1995 WL 640770, at *2 (S.D.N.Y. Oct. 31, 1995) (finding a Rule 11 violation where plaintiff failed "to properly plead a single element of a substantial RICO claim .... [which] manifest[ed] a total lack of legal research and preparation on the part of plaintiff's attorney); *Levy* v. *Aaron Faber, Inc.*, 148 F.R.D. 114, 123 (S.D.N.Y. 1993) (imposing Rule 11 sanctions where "even a cursory investigation into the pleading requirements for RICO would have revealed the inadequacy of [plaintiff's] RICO pleading").  Further, Rule 11 sanctions may also be imposed

for baseless factual allegations.  *See Levine* v. *F.D.I.C.*, 2 F.3d 476, 479 (2d Cir. 1993).  The creativity of an attorney may not transcend the facts of a given case.  *See id.*; *accord In re Kelly*, 808 F.2d 549, 551 (7th Cir. 1986) (when an attorney "chose to state as fact what was at the best a guess and a hope, he engaged in misrepresentation").

If a court determines that Rule 11(b) has been violated, Rule 11(c) authorizes the court to "impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."  Fed. R. Civ. P. 11(c)(1).  Such a sanction, however, "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated.  The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."  Fed. R. Civ. P. 11(c)(4); *see LCS Grp., LLC* v. *Shire LLC*, No. 18 Civ. 2688 (AT), 2019 WL 1234848, at *18 (S.D.N.Y. Mar. 8, 2019) (concluding that appropriate sanctions on defendant and its counsel under Rule 11 for asserting frivolous RICO claims consisted of "reasonable attorney's fees and other expenses associated with briefing the motion to dismiss and the motion for sanctions"); *see also AJ Energy LLC* v. *Woori Bank*, No. 18 Civ. 3735 (JMF), 2019 WL 4688629, at *12 (S.D.N.Y. Sept. 26, 2019) (awarding attorney's fees and costs where complaint was implausible on its face and assertions clearly lacked reasonable evidentiary support).

If sanctions are imposed, a court must also consider how, if at all, to apportion them between counsel and client.  To begin, the court must assess each one's respective responsibility for the offending conduct.  *See United Republic Ins. Co., in Receivership* v. *Chase Manhattan Bank*, 315 F.3d 168, 171 (2d Cir. 2003) (concluding that Rule 11 sanctions should not be imposed on client where attorney bore principal responsibility for any sanctionable conduct); *Greenberg* v. *Hilton Int'l Co.*, 870 F.2d 926, 939 (2d Cir. 1989) (limiting Rule 11 sanctions to counsel where client unaware of abuses), *vacated on other grounds*, 875 F.2d 39, 42 (2d Cir. 1989); *see also Judin* v. *United States*, 110 F.3d 780, 785 (Fed. Cir. 1997) (analyzing analogous Court of Claims rule and finding that "[i]n imposing Rule 11 sanctions, a court may allocate sanctions between an attorney and client according to their relative fault" (citing *Borowski* v. *DePuy*, 850 F.2d 297, 305 (7th Cir. 1988))).  At base, the court must distinguish clients who were not adequately advised by counsel that their conduct violated Rule 11 from clients who knew their actions were wrongful, or who misled their attorneys about the facts relating to, or the purposes underlying, the lawsuit.

Notably, additional restrictions pertain in the context of sanctions imposed for improper legal (as distinguished from factual) arguments. "Sanctions that involve monetary awards (such as a fine or an award of attorney's fees) may not be imposed on a represented party for causing a violation of subdivision (b)(2), involving frivolous contentions of law.  Monetary

responsibility for such violations is more properly placed solely on the party's attorneys." Fed. R. Civ. P. 11, 1993 Advisory Committee Notes.

### 2.    Analysis

The Benrimon Defendants make four arguments for sanctions under Rule 11; *first*, that Plaintiff's RICO claims against them are frivolous; *second*, that Plaintiff's state-law claims are frivolous; *third*, that Plaintiff's allegations concerning the Shtar Isko are legally frivolous and factually wrong; and *fourth*, that Plaintiff continues to make false and unsubstantiated allegations tying the Benrimon Defendants to the Leger.  For the reasons explained below, the Court awards the Benrimon Defendants' a portion of their attorneys' fees and costs in defending against certain of Plaintiff's RICO claims.

### a.    The Court Finds the Safe Harbor Provision of Rule 11 to Be Satisfied

At the outset, the Court addresses the parties' dispute with regard to whether the Benrimon Defendants have complied with the safe harbor provision of Rule 11(c)(2).  That provision requires a party seeking sanctions to serve its motion on the party to be sanctioned, pursuant to Rule 5, affording the party upon whom the motion is served 21 days to correct or withdraw the allegedly sanctionable filing.  *See* Fed. R. Civ. P. 11(c)(2).

Plaintiff argues that the Benrimon Defendants served their Rule 11 motion on him on October 16, 2019, only two days before the motion was filed with the Court, and that the Benrimon Defendants did not also serve upon him their brief in support of their motion to dismiss the Complaint.  (*See* Pl. Sanctions Opp. 2).  The declaration supporting Plaintiff's opposition to the

sanctions motion attaches an email thread between counsel for the Benrimon Defendants and counsel for Plaintiff. (*See* Weiss Decl., Ex. 1). It demonstrates that, on the evening of October 16, 2019, counsel for the Benrimon Defendants sent their brief in support of the motion for sanctions to Plaintiff's counsel. (*Id.*). Plaintiff's counsel responded the next day, confirming that he had received and reviewed the Benrimon Defendants' Rule 11 motion and responding, "we are not withdrawing the first amended complaint or case. In my opinion, your Rule 11 motion lacks any merit." (*Id.*). This exchange came after the Court's July 29, 2019 pre-motion conference, during which the Court engaged in an extensive colloquy with the parties about the bases for the Benrimon Defendants' motions to dismiss and for sanctions. (*See generally* July 29, 2019 Tr.). True to his word, Plaintiff and his counsel did not withdraw the first amended complaint or this action in response to the Benrimon Defendants' motions.

The Court recognizes that the safe harbor requirement is a strict procedural requirement. *See Star Mark Mgmt.,* 682 F.3d at 175; *Hadges* v. *Yonkers Racing Corp.*, 48 F.3d 1320, 1328 (2d Cir. 1995). The Second Circuit has held, for instance, that informal warnings and requests for sanctions in letters, without separate service of the motion, do not trigger Rule 11's 21-day fair warning requirement. *See Star Mark Mgmt.,* 682 F.3d at 175-76 (citing cases); *see also Gal* v. *Viacom International, Inc.*, 403 F. Supp. 2d 294, 309 (S.D.N.Y. 2005) ("[T]he plain language of the rule states explicitly that service of the motion itself is required to begin the safe harbor clock — the rule says

nothing about the use of letters").  At the same time, neither party points to any controlling law, and the Court's independent research discloses none, on the precise issue facing the Court:  Whether a party seeking to file a sanctions motion must wait 21 days, when the party upon whom such motion was served explicitly confirms, in writing, that it will not withdraw or amend its allegedly sanctionable filing.

In *Perpetual Securities, Inc.* v. *Tang*, 290 F.3d 132 (2d Cir. 2002), the Second Circuit held that the appellees' Rule 11 sanctions motion had been procedurally improper because it was not "made separate from other motions or requests." *Id.* at 142.  The appellees' sanctions motion had instead been included in a brief that addressed the underlying issues before the district court.  *Id.*  The district court's consequent award of sanctions under Rule 11 was thus found to be an abuse of discretion.  *Id.*  But rather than foreclosing the possibility of sanctions, the Second Circuit remanded the case back to the district court to reconsider the sanctions request, explicitly stating:

> Our decision to remand for reconsideration of the sanctions issues does not conflict with our decision in *Hadges* to reverse an award of sanctions for failure to adhere to the procedural requirements of Rule 11.  *See Hadges*, 48 F.3d at 1329.  In *Hadges*, it was clear that the sanctioned party would have corrected his misstatements had he been afforded the opportunity to do so; a reversal was thus appropriate.  *See id.* at 1328.  *Here, there is no indication that Perpetual would have corrected or amended its frivolous arguments even had it been given the opportunity.*

*Id.* (emphasis added).

Courts have interpreted *Perpetual Securities* to find that the "failure to follow the safe harbor provisions perfectly may be excused where there is 'no indication that [a party] would have corrected or amended its frivolous arguments even had it been given the opportunity.'" *Watkins* v. *Smith*, No. 12 Civ. 4635 (DLC), 2013 WL 655085, at *6 (S.D.N.Y. Feb. 22, 2013) (quoting *Perpetual Securities*, 290 F.3d at 142); *see id.* at *7 (holding that premature filing of sanctions motion was excused where it was clear that plaintiff would not have withdrawn or corrected his frivolous allegations); *see also Lan* v. *Time Warner, Inc.*, No. 11 Civ. 2870 (AT) (JCF), 2015 WL 4469838, at *1-2 (S.D.N.Y. July 13, 2015) (same). That is clearly the case here. In response to being served with the Benrimon Defendants' Rule 11 motion, Plaintiff's counsel confirmed in writing that he and his client would not be withdrawing the Complaint.[18] Plaintiff then proceeded to defend the allegations and claims in his Complaint on their merits. Even today, he stands by these allegations. Accordingly, the Court is certain that Plaintiff would not have withdrawn or amended the Complaint, even if he had been provided the full 21 days. Any technical violation of the safe harbor provision is therefore excused, and the Court will consider the merits of the Benrimon Defendants' sanctions motion.

---

[18]   Plaintiff's argument that the Benrimon Defendants did not provide him with a copy of their brief in support of their motion to dismiss is a non-starter. The Benrimon Defendants' brief in support of their motion for sanctions thoroughly describes the bases for the requested sanctions. (*See generally* Benrimon Sanctions Br.). And, further, the technical requirements of the safe harbor provision do not impose upon the Benrimon Defendants the obligation to provide Plaintiff with their brief in support of their separate motion to dismiss. *See Star Mark Mgmt., Inc.* v. *Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 176-77 (2d Cir. 2012).

> **b.**   **The Benrimon Defendants Are Entitled to a Portion of the Reasonable Attorneys' Fees and Costs Incurred in Defending Against Certain of Plaintiff's RICO Claims**

The Benrimon Defendants seek sanctions for defending against each of Plaintiff's RICO claims, and the Court thus begins its analysis with Count I of the Complaint, which alleges a substantive RICO claim against David and Linda Benrimon, and Count II, which alleges a RICO conspiracy claim. The Court has dismissed these claims for failure to satisfy the relatedness, continuity, and nexus requirements for a RICO claim. As previously detailed, Plaintiff's Complaint is brimming with conclusory allegations. The vast majority of Plaintiff's fraud allegations have not been pleaded with the particularity required by Rule 9(b), and his allegations as a whole fail to satisfy multiple RICO pleading requirements. But buried within this haystack of allegations, the Court has identified a few needles. These factual allegations, from which the Court was able to discern the existence of the *Le Compotier* Acts and the Pledge Agreement Acts, have not been (and, under the governing law, cannot be) joined together to show a pattern of racketeering activity. However, the Court cannot say that Plaintiff's attempt to do so was entirely frivolous or otherwise objectively unreasonable. Thus, the Court will not grant the Benrimon Defendants sanctions as to Counts I and II.

The Benrimon Defendants also seek sanctions for defending against Count VIII of the Complaint, which identifies the Gallery as a RICO enterprise and alleges that the Benrimon Defendants conspired with Chowaiki to facilitate the latter's pattern of racketeering activity through the enterprise. This claim

fails for many of the same reasons that Counts I and II failed, and it is additionally inadequate because the Complaint lacks sufficient allegations that the Benrimon Defendants agreed with Chowaiki to violate RICO's substantive provisions, a required element of a RICO conspiracy. Again, however, this claim is not so far-fetched as to be sanctionable.

The unlawful debt collection claims, however, are a different story. Counts III through VI are predicated on the Benrimon Defendants' alleged violation of RICO through the "collection of unlawful debt." The Court dismisses these claims, as explained above, because the Complaint lacks sufficient allegations that any of the Benrimon Defendants was "in the business" of making usurious loans, a required element for such claims. But dismissal is not enough.

In his original complaint (*see* Dkt. #1), Plaintiff failed to allege that any of the Benrimon Defendants was "in the business" of making usurious loans — a necessary element of an unlawful debt claim requiring allegations of "other individuals or companies to whom [defendants] lent money or the usurious interest rates attached to any other loan by the defendants." *Weisel*, 197 F.R.D. at 241. Instead, the original complaint alleged a single usurious loan by Piedmont. The Benrimon Defendants raised this deficiency in their pre-motion letter. (*See* Dkt. #14 at 2). And during the July 29, 2019 pre-motion conference, Plaintiff's counsel assured the Court that he would amend the complaint to "make it very clear" that the Benrimon Defendants were "making usurious loans, in the business of usurious loans." (July 29, 2019 Tr. 4:1-5).

Despite those assurances, the Complaint as amended still contains a single allegation of a single usurious transaction: the $300,000 loan from Piedmont to the Gallery. (Compl. ¶¶ 81-91). Yet, inexplicably, Plaintiff has attempted to string out this one instance to four separate causes of action that implicate all six Defendants. To do so, Plaintiff attempts to bolster his unlawful debt allegations by stating, in vague and conclusory fashion, that "Piedmont and Avichai Rosen's business is to lend money or a thing of value at a usurious rate." (Compl. ¶ 85). Such an allegation is, of course, patently insufficient. Worse yet, with respect to Count V, the Complaint lacks even conclusory allegations that the Benrimons were "in the business" of making usurious loans. Given the conspicuous absence of supporting allegations for these claims, the Court is in complete agreement with the Benrimon Defendants that the unlawful debt collection claims against them are particularly egregious, and that Plaintiff's persistence in advancing these claims for which he has no articulable legal or factual basis is objectively unreasonable. *See McCabe*, 761 F. App'x at 41 (noting that Rule 11 sanctions require "objective[] unreasonab[leness]").

In imposing sanctions on Plaintiff for the unlawful debt collection claims in this case, the Court also considers the recklessness with which Plaintiff makes certain factual allegations. For example, as part of his RICO claims, Plaintiff alleges that the Benrimon Defendants committed fraud on the court in the Criminal Case by not disclosing the Shtar Isko, an agreement that, according to Plaintiff, shows that Piedmont and Chowaiki "were actually 50%-

78

50% equal partners — and not unrelated *bona fide* purchasers for value reasonably without knowledge to believe that the property was subject to forfeiture." (Compl. ¶ 76). The Benrimon Defendants argue that the allegations concerning the Shtar Isko are sanctionable because: (i) Piedmont did disclose the existence of the Shtar Isko in the Criminal Case; and (ii) it is settled law that a Shtar Isko document does not create a legally enforceable partnership. (Benrimon Sanctions Br. 8).

The Benrimon Defendants are correct that Plaintiff's allegation is factually inaccurate. When Piedmont filed its petition for the Picasso in the Criminal Case, it included as an exhibit the Note between Piedmont and Chowaiki. (*See* Criminal Case, Dkt. #57). The Note explicitly states that the Gallery "shall pay, in accordance with Heter Iska, all outstanding principal to" Piedmont. (*Id.* at Ex. A). This document is filed publicly on the Criminal Case docket, on which Plaintiff so heavily relies in his Complaint. In alleging that Piedmont did not disclose the existence of the Shtar Isko in the Criminal Case, Plaintiff either failed to conduct a reasonable inquiry into the Criminal Case, or alleged something he knew to be false. In either case, the accusation that the Benrimon Defendants committed a fraud on the criminal court was completely unwarranted. Plaintiff's failure to correct this allegation evinces a carelessness with lodging very serious accusations that greatly troubles the Court.

Having determined that sanctions are warranted for the unlawful debt collection RICO claims, the next issue concerns who, as between Plaintiff and his counsel, is responsible for the sanctionable conduct. On this record, the

Court finds it difficult to discern the degree to which Plaintiff himself had a hand in making frivolous claims and unsupported factual contentions. But for several reasons, the Court believes the sanctions here are appropriately placed on Plaintiff's counsel.

*First*, the Court's decision to impose sanctions is, in large part, due to the Complaint's overstep in asserting four RICO claims for collection of unlawful debt against all six Defendants in this action, based on allegations of a single usurious loan. Putting aside the 1993 Advisory Committee Notes to Rule 11, which state that sanctions based on frivolous contentions of law are properly placed on a party's counsel, it was Plaintiff's counsel who was warned at the July 29, 2019 pre-motion conference that a single allegation of a usurious loan would not suffice to plead such RICO claims adequately. And it was Plaintiff's counsel who told the Court that he would remedy such deficiency in the amended complaint, yet failed to do so. Thus, all facts before the Court indicate that Plaintiff's counsel is responsible for seeking to transmogrify a single transaction with a subset of Defendants into four RICO claims against all Defendants alleging that all were "in the business" of making usurious loans. The Complaint is signed by Plaintiff's counsel; Plaintiff's counsel appeared at the pre-motion conference; and Plaintiff's counsel wrote and filed the opposition briefs, defending the RICO claims. *See Edmonds*, 2009 WL 4404815, at *5 (sanctioning attorney whose "continued reliance on RICO to prosecute what [was] clearly a private wrong alleged against his former partners and their accounting firm, exhibit[ed] a fundamental lack of

familiarity with, or misunderstanding of, the civil RICO statute and the grounds for such an action"); *Dangerfield*, 2003 WL 22227956, at *12-13 (sanctioning attorney where "no attorney conducting a reasonable inquiry into the legal viability of [plaintiff's] RICO claim could have thought it had any chance to succeed").

*Second*, Plaintiff's counsel is also responsible for the inaccurate factual allegations.  Plaintiff's counsel signed the Complaint, indicating that he made the necessary inquiry into the factual allegations substantiating the claims.  At bottom, Plaintiff's counsel is responsible for the allegations concerning disclosure of the Shtar Isko and the reputational effects of asserting that the Benrimon Defendants committed fraud in both the Criminal Case and Bankruptcy Case.  *See Hoatson*, 2007 WL 431098, at *9-10 (imposing sanctions on attorney where "the pleadings [were] so far removed from adequate that they cannot be said to have been filed in good faith or after a reasonable inquiry").

For these reasons, the Court has determined, despite resolving all doubts in his favor, that certain of Plaintiff's counsel's arguments concerning RICO are "losing *and* sanctionable."  *Rodick* v. *City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1994).  The Court has determined that the Benrimon Defendants are entitled to a portion of the reasonable attorneys' fees and costs they incurred in defending against the RICO claims in Counts III, IV, V, and VI in this action. *See Bus. Guides, Inc.*, 498 U.S. at 548 (confirming that Rule 11 "states unambiguously that any signer must conduct a 'reasonable inquiry' or face

sanctions"). In this regard, the Court recognizes that it has the discretion either to award an absolute number now that it believes fairly vindicates the purposes of Rule 11, or to wait and award fees and costs after review of a fee petition filed by the Benrimon Defendants' counsel and responded to by Plaintiff's counsel. For several reasons, it chooses the former, and will order Plaintiff's counsel to pay a sanction of $20,000 to the Benrimon Defendants.

To begin, the Court recognizes that it may be difficult for defense counsel to separate out the precise amount of fees and costs that were attributable to defending against Plaintiff's unlawful debt collection counts specifically. Moreover, as this section makes clear, not all of Plaintiff's RICO arguments were sanctionable, even if all were ultimately unavailing. The Court also recognizes the disparity in size between Plaintiff's counsel and the Benrimon Defendants' counsel, and strives to sanction, without wholly bankrupting, Plaintiff's counsel. Finally, the Court realizes that a fee petition will itself generate attorneys' fees and costs for which Plaintiff's counsel should arguably be responsible, and wishes to minimize the resources that have been and are contemplated to be expended in this effort.

Ultimately, the Court is reminded that "the principal objective of the imposition of Rule 11 sanctions is not compensation of the victimized party but rather the deterrence of baseless filings and the curbing of abuses." *Caisse Nationale de Credit Agricole-CNCA* v. *Valcorp, Inc.*, 28 F.3d 259, 266 (2d Cir. 1994); *see also Estate of Calloway* v. *Marvel Entertainment Group*, 9 F.3d 237, 241 (2d Cir. 1993) ("Rule 11 is not a fee-shifting mechanism and does not

create an entitlement in adverse parties to compensatory damages or attorney's fees....  Rather it is intended 'to maintain the integrity of the system of federal practice and procedure.'" (citation omitted)), *cert. denied*, 511 U.S. 1081 (1984). The Court acknowledges that the $20,000 sanction imposed will not fully compensate the Benrimon Defendants for the fees and costs expended on the unlawful debt collection issue, but it will fully punish Plaintiff's counsel for his conduct in accordance with the letter and spirit of Rule 11.

### c. The Benrimon Defendants Are Not Entitled to Sanctions for Plaintiff's State-Law Claims

The Benrimon Defendants also move for sanctions with respect to Plaintiff's state-law claims.  Plaintiff's fraud claim against the Benrimon Defendants is dismissed because, as the Court explained above, Plaintiff has not alleged a single misstatement or omission that any of the Benrimon Defendants made to Plaintiff.  To the extent Plaintiff pleaded that the Benrimon Defendants conspired with Chowaiki to defraud Plaintiff, the Court has also dismissed this claim, as Plaintiff has not alleged any agreement between them to make any misrepresentation to Plaintiff.  However, the Court has found that Plaintiff adequately pleaded his claims for conversion and replevin against the Benrimon Defendants, at least with respect to the Picasso.  While Plaintiff's fraud arguments are a stretch, the Court finds that the filing of these state-law claims was not objectively unreasonable and, further, that some of the other factors that animated the Court's decision to impose sanctions for the RICO claims (*e.g.*, the allegations regarding the Shtar Isko and the stigmatizing effect of a RICO claim), are not present with respect to the state-law claims.  For this

reason, the Court will not sanction Plaintiff or his counsel for alleging these state-law claims against the Benrimon Defendants.

### d. The Benrimon Defendants Are Not Entitled to Sanctions for Plaintiff's Allegations Tying the Benrimon Defendants to the Loss of the Leger

The Benrimon Defendants' final argument on this point is that Plaintiff should be sanctioned because the Complaint contains numerous allegations that Plaintiff lost the Leger as a direct result of the Benrimon Defendants' actions.  At the pre-motion conference in this case, counsel for Chowaiki explained to the Court and counsel for all parties that "the Benrimons had nothing to do with Leger at all." (July 29, 2019 Tr. 42:12-14).  Plaintiff's counsel seemed to agree that the Benrimon Defendants were not directly responsible for the Leger.  Counsel told the Court, with respect to the original complaint, that "[t]here were no allegations that [the Benrimon Defendants] participated in the Leger," and that "there certainly won't be [any] in the amended complaint." (*Id.* at 55:24-56:2).  Plaintiff's counsel also clarified the allegation as stating that the Benrimon Defendants participated in a conspiracy with Chowaiki that led to Plaintiff's loss of the Leger.

The Benrimon Defendants now argue that, despite Plaintiff's counsel's assurances during the pre-motion conference, Plaintiff continues to assert that the Benrimon Defendants are responsible for the loss of the Leger.  The Court understands this argument, but does not read the Complaint's allegations as accusing the Benrimon Defendants of directly causing Plaintiff to lose the

Leger.  The Benrimon Defendants cite to the following provisions of the

Complaint:

- David and Linda Benrimon, David Benrimon Fine Art LLC, Piedmont Capital LLC, Avichai Rosen, and Ezra Chowaiki — each knowing that Ezra Chowaiki was engaged in a pattern of Racketeering Activity for the explicit purpose of fraudulently defrauding art-owners of the works of art they had consigned to the Gallery — agreed with each other to join, facilitate, further, and to participate in Ezra Chowaiki's pattern of Racketeering Activity, by their own actions, as set out in ¶¶ 21, 26, 28, 33, 59, 60, 61, 63, 64, 72, 75, 79, 80, 86, and related paragraphs, above, and conspired with each other to do so, in violation of 18 U.S.C. § 1962 (d).  As a result, plaintiff was injured by the loss, theft, fraudulent taking, or conversion of his Picasso, le Gueridon and his Leger.  (Compl. ¶ 111).

- As a direct and proximate result of the conspiracy defendants' predicate actions in furtherance of violating 18 U.S.C. § 1962(d), as described in above, plaintiff has been and is continuing to be injured in his business or property, including by the unlawful conversion of his Leger and his Picasso's le Gueridon, and as set forth more fully above. Each of the conspiracy defendants is jointly and severally liable to plaintiff pursuant to 18 U.S.C. § 1964(c).  (*Id.* at ¶ 140).

- Each of Linda and David Benrimon, Avichai Rosen, David Benrimon Fine Art LLC, and Piedmont Capital LLC, knowing that Ezra Chowaiki was defrauding plaintiff and other art owners of the art works they had consigned to Ezra Chowaiki's Gallery, and knowing of Ezra Chowaiki's scheme and plan to do so, conspired and agreed with Mr. Chowaiki to join that scheme and advance it, and engaged in actions, as set out in this Complaint to do so.  And plaintiff was harmed thereby in the loss of le Gueridon and the Leger.  (*Id.* at ¶ 143).

- Each of the defendants, knowing that Ezra Chowaiki was unlawfully selling art consigned to his Gallery against their owners' wishes, agreed and conspired with each other to participate in that scheme.  Each defendant intentionally took overt acts in furtherance of

> that agreement to defraud art owners of the art they had
> consigned to Mr. Chowaiki's Gallery. And plaintiff was
> harmed thereby by the loss of his le Gueridon and
> Leger. (*Id.* at ¶ 148).

(*See* Benrimon Sanctions Br. 10-11). The Court acknowledges the imprecision of these allegations, but reads them merely to allege Plaintiff's loss of the Leger as a result of a conspiracy between Chowaiki and the Benrimon Defendants, which is true to what Plaintiff's counsel stated at the pre-motion conference. Conversely, the Court does not read these allegations as indicating that "Plaintiff lost the Leger as a direct result of the Benrimon Defendants' actions." (*Id.* at 10). Accordingly, the Benrimon Defendants' motion for sanctions is denied insofar as it seeks sanctions for Plaintiff's allegation that the Benrimon Defendants were involved in Plaintiff's loss of the Leger.

## CONCLUSION

For the reasons explained above, the Court GRANTS IN PART and DENIES IN PART Defendants' motions to dismiss. All of the RICO claims in this action are dismissed. Plaintiff may pursue his state-law fraud, conversion, and replevin claims against Defendant Chowaiki for the Picasso and the Leger, and Plaintiff may pursue his state-law conversion and replevin claims against the Benrimon Defendants for the Picasso. All other state-law claims are dismissed.

Defendants are hereby ORDERED to file answers to the remaining claims against them on or before **May 15, 2020**.

Counsel for Plaintiff is ORDERED to pay sanctions under Fed. R. Civ. P. 11 in the amount of $20,000 to the Benrimon Defendants on or before **May 22, 2020**.

The parties are hereby ORDERED to provide a proposed case management plan to the Court on or before **May 22, 2020**.

SO ORDERED.

Dated:   April 24, 2020
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge